UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X
                                                   :

BRANDON WHITE                          :

                 Plaintiff,           :

v.                                   :       Civil Case No. 1:25-cv-2910-ALC

THE NEW SCHOOL                  :

                Defendant.      :

-------------------------------------------------------------X

## FIRST AMENDED COMPLAINT

Plaintiff Brandon White ("White") hereby sues Defendant The New School ("TNS") as follows:

## <u>INTRODUCTION</u>

1.    This case is about an educational institution that claims to foster creativity, free expression, and justice but betrayed these values—and one of its students—to appease a mob of vicious antisemites. It is about how this school abandoned and scapegoated Brandon White, a promising young artist who trusted the institution to shepherd his growth and development. And it is about the personal, professional, and creative harm White suffered due to The New School's systematic refusal to address the rampant antisemitic and anti-Israeli discrimination by radical students, staff, faculty, and outsiders on its campus.

2.    Beginning after Hamas's terror attack against Israel on October 7, 2023, a protest movement formed at TNS. Its participants continually engaged in greater and greater acts of disruption and discrimination with the intention of coercing TNS's leadership into acquiescing to

its demands, including discriminatory boycotts targeted against Israelis based on their national origin.

3.    For months on end, TNS's administration actively refused to enforce its own conduct rules and nondiscrimination policies against the protest movement—instead consistently acceding to the protestors' demands and rewarding them when they escalated, creating an incentive structure that, as recognized and acted upon by the protestors, encouraged the protestors to continuously escalate their disruption of TNS's educational activities.

4.    The protest movement's activities, and TNS's refusal to address them, created a hostile educational environment for Jews and Israelis at TNS, the majority of whom reported feeling unwelcome, unprotected, and unsafe on campus, and abandoned by TNS's administration.

5.    Plaintiff Brandon White was targeted by these protestors in December 2023, when protestors blockading campus buildings prevented him from attending class and subsequently targeted him with slurs, physical force, and defamatory retaliation based on their perception that he is Jewish and/or Israeli.

6.    As White attempted to enter TNS's University Center for class, protestors blocked his entry, repeatedly shoved him back, called him a "Zio" (short for "Zionist"), and pursued him out of the building, yelling threats at him as he tried to leave the scene.  The protestors then started a retaliatory smear campaign against White, disseminating his photograph online alongside defamatory and false accusations that he is a bigot who tried to assault the protestors.

7.    When White brought his complaints about the protestors targeting him with antisemitic/anti-Israeli discrimination to TNS, TNS refused to investigate for months on end—but immediately started an investigation *against* White based on retaliatory and false complaints from two of the protestors who shoved, harassed, and defamed him.

8.    While refusing to investigate White's Title VI claims, TNS further refused to enforce a No-Contact order and its retaliation policies to protect White from his harassers' ongoing campaign to "ruin his life."  The investigation process itself was handled haphazardly and inconsistently by administrators who needlessly delayed the process, failed to respond to White's requests for clarification and protection from his accusers' harassment, and arbitrarily changed procedure without notice, explanation, or consultation.  Even after TNS began an investigation into White's Title VI complaints, the investigation was riven with errors.

9.    TNS ultimately resolved the grievance process for both White's and his harasser's claims in May 2024, six months after the December 4, 2023, protest.  TNS inexplicably found that no disciplinary action was necessary and refused to take any measures to address the hostile environment White was suffering or protect him from the harassment campaign against him.  TNS also refused White's requests for personal protection when his harassers and their protest group unlawfully occupied TNS's University Center, leaving White to fear for his safety when using campus resources.

10.    As a result of the hostile environment TNS enabled and perpetuated through its refusal to protect White from discrimination and through its arbitrary and inconsistent grievance process, White suffered mental and emotional damages, interference with his education, and loss of business opportunities for which TNS is liable.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction 28 U.S.C. §§ 1331 and 1343 because claims pursuant to Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq*. ("Title VI") arise under the laws of the United States.  This Court has supplemental jurisdiction under 28 U.S.C.

§ 1367 to hear the related state law claims because those claims arise out of the same case or controversy as the federal claims.

12.    This Court has personal jurisdiction over The New School because it is based in and operates in New York, New York.

13.    Venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this judicial district.

## PARTIES

14.    Plaintiff Brandon White is a graduate of TNS and a professional artist.  At all times relevant to this Complaint, he was a student in good standing at TNS.

15.    Defendant The New School is a private arts university located in New York, New York.

## STATEMENT OF FACTS

**I.  The New School generally refuses to address the hostile environment against Jews and Israelis on campus.**

**A.  Hamas's October 7, 2023, terrorist attack on Israel.**

16.    On October 7, 2023, the terrorist group Hamas invaded Israel from Gaza to commit a wave of murders, tortures, rapes, and kidnappings.  Hamas killed approximately 1,200 Israelis, including entire families along with their infants, and kidnapped a further 251 individuals.

17.    Though Hamas's terror attack received international condemnation, it also received international support from various radical causes and other terrorist groups.

18.    Immediately following the October 7th attack, and prior to Israel's major response against Hamas, a massive and often violent protest movement erupted against Israel on campuses across the United States.

19.     Led by national organizations with campus chapters like National Students for Justice in Palestine, students, faculty, outside activists, and agitators of various kinds led mass demonstrations on many campuses.  These demonstrations included marches across campus, disrupting classes, rallies, and occupations of school buildings.

**B. Protestors at The New School begin a campaign of disruption and harassment targeting administrators and students, for which The New School promises to never punish them.**

20.     In the wake of the October 7th attack, a protest movement began at TNS, spearheaded largely by the campus group Students for Justice in Palestine ("SJP").  The protest movement was marked by extreme views that justified the October 7th attack and violence and harassment against Israelis and "Zionists" generally, including those suspected of being Israeli or "Zionist" at TNS.  An early example of the protest movement's extreme views and conduct was SJP's ferocious condemnation of TNS's Interim President Donna Shalala for sending a campus-wide email expressing shock and outrage about the October 7th attack.[1]  SJP then released its own statement expressly supporting the October 7th attack and stating that the terror attack was legitimate "resistance."[2]

21.     SJP then began leading successive protest actions intended to disrupt TNS's operation and interfere with educational activities, with the goal of coercing TNS's leadership into submitting to its list of demands.  SJP's demands included a boycott discriminating against Israelis

---

[1] Agnes Applegate, T*he New School's Students for Justice in Palestine group condemns President Shalala's statements*, New School Free Press (Oct. 22, 2023), https://www.newschoolfreepress.com/2023/10/22/the-new-schools-students-for-justice-in-palestine-group-condemns-president-shalalas-statements/.
[2] The New School SJP (@tns.sjp), Instagram (Oct. 12, 2023), https://www.instagram.com/p/CyUq5giLBTI/?img_index=8.

based on national origin.   To force President Shalala into surrendering to its demands, SJP threatened to use "any means necessary:"

> We, the New School Students for Justice in Palestine, call on the University's Administration to respond to our demands by December 1st, 2023. If we receive no response by this time, we will assume that this University is willingly invested in the genocide of the Palestinian people, and we will respond accordingly and by any means necessary.[3]

As part of its campaign to force its demands on TNS, SJP staged a mass walkout of hundreds of students and then attempted to take over President Shalala's office with a "sit-in."

22.     President Shalala's response to SJP's demands and attempts to coerce her surrender by interfering with TNS's educational mission was ineffectual.   Though she did not agree to SJP's demands and claimed that "any violence, bullying, or disruption against any member of this community that threatens their right to go to class, teach, conduct scholarship and creative practice, and support academic learning will be dealt with firmly under our rules of conduct," she did not impose any consequences against SJP or any of its members for their multiple disruptive actions or use of threats in support of their actions.[4]

23.     This failure to punish SJP and other protestors at TNS for disrupting its educational mission and harassing students, staff, and faculty was systemic.   Despite President Shalala's firm words, TNS took no action to address the protest movement's ongoing discriminatory and harassing conduct at TNS that was intended to interfere with university function and that bullied and intimidated students, staff, and faculty based on actual or perceived identity as Jews or Israelis.

---

[3] Open Letter from SJP to the Administration of The New School (Nov. 9, 2023) (available here: https://docs.google.com/document/d/1YdncSahvtPgX-grff8UM42ioe5l47mj1Oh703X6xRU8/edit?tab=t.0).

[4] *A Message from Interim President Shalala: In Response to the Students for Justice in Palestine (SJP) Demands Letter to the Administration* (Nov. 15, 2023) (available here: https://docs.google.com/document/d/1o_PMno8FTl8lQlcDwd3v1OH4BCjg0ZvxGfF2lhMQfVQ/edit?tab=t.0).

24.    Over the weeks and months that followed, SJP and other protestors spread posters around campus stating, "Zionists fuck off;" masked protestors on-campus chanted and carried signs threatening, "Intifada until victory"—a slogan referring to violent terrorism against Israeli and Jewish civilians in support of Hamas's political goals; campus bathrooms were defaced with graffiti stating, "Abolish the settler state" and "Zionism is terrorism;"[5] an outside lecturer invited by SJP to a "teach-in" protest on campus claimed that the murders, rapes, mutilations, and beheadings committed, filmed, and publicized by Hamas terrorists on October 7th were "fake news" and "Zionist propaganda:"

> Don't take what the media says … They try to say 'Oh my God, you're supporting rapists and people that behead babies' ... we know it's not true.  These groups [Hamas and allied terrorist organizations] are fighting for the liberation of their people and their land. That's a right.[6]

Jewish and Israeli students were directly discriminated against, with some denied academic opportunities for being "Zionist," directly interfering with their ability to complete course work.[7] One Israeli student described how he met with TNS's leadership repeatedly to discuss the hostile environment, "up to three meetings a day," but received no assistance:

> [The protests] crossed the line long ago.  When a student says to another student, "I wish you had been in Israel on October 7 so you would have been raped, too," or "I hope you get stabbed on the street," the meaning does not rely on understanding the "context."  Someone has to stop that student and let him know there will be consequences."
>
> Instead, a New School administrator told [the student] to "get out of here, leave the building; it's too dangerous for you now." I said, "if you think it's dangerous for me, why don't you do anything?"  He just gave me a blank look.[8]

---

[5] Brian Blum, *'I wish you were there on October 7': Antisemitism at The New School-opinion*, The Jerusalem Post (Jan. 28, 2024), https://www.jpost.com/opinion/article-783734.

[6] Snejana Farberov and Ronny Reyes, *NYU prof caught telling students Hamas baby killings 'not true' suspended after shocking clip revealed*, New York Post (Jan. 25, 2024), https://nypost.com/2024/01/25/news/nyu-professor-tells-students-hamas-baby-killings-not-true/.

[7] Blum, *supra* note 5.

[8] *Id*.

25.     Due to TNS's systemic refusal to impose any consequences on SJP or other members of the protest movement, they continued their disruptive and harassing activities, growing bolder over time.  On December 4, 2023, SJP organized a blockade of university buildings to shut down access to classes and educational resources.  As described further within the Complaint, Plaintiff White was assaulted and discriminated against by SJP members, including its president, at this protest—which TNS refused to investigate for five months, instead prioritizing an investigation *against* White based on his harassers' false and retaliatory complaints against him. Even after finally opening an investigation into White's complaints, TNS ultimately dismissed the matter without any disciplinary action against the protestors who attacked, defamed, and retaliated against him.

26.     In March 2024, SJP and other protestors disrupted a speaking event on campus featuring a survivor of the October 7th attack hosted by the campus Jewish group Hillel, forcing their way into the lecture hall, interfering with the event, banging on walls and doors, calling the Jews and Israelis at the event murderers, and chanting slogans supporting the violent expulsion of Jews from Israel.[9]  Members of Hillel, TNS administrators, the speaker, and his sister required police protection from the protestors and were forced to leave the event with police assistance and use multiple different exits after the protestors attempted to rush them.[10]  TNS imposed no punishments on SJP or any protestors related to this event.

27.     In April 2024, SJP created a "Gaza Solidarity Encampment" at TNS's University Center patterned after the similar encampment at Columbia University.  The protestors took over

---

[9] Rhea Nayyar, *Protesters Disrupt Event With Israeli Soldier on New School Campus*, Hyperallergic (Mar. 7, 2024), https://hyperallergic.com/876403/protesters-disrupt-event-with-israeli-soldier-on-new-school-campus/.
[10] *Id*.

a portion of the University Center, creating a fire hazard and refusing to leave when informed of the hazard they created, demanding that President Shalala transmit their demands to TNS's board of trustees—demands which again included a boycott targeted against Israelis based on national origin.[11]   Despite the protestors disrupting campus activities to coerce TNS into imposing a discriminatory boycott against Israelis, President Shalala agreed to assist them in making their demand that TNS divest from businesses supportive of Israel and agreed not to charge the protestors with any conduct violations.[12]   She personally handed the students approximately $300 in cash because the "students negotiated in good faith and [she] admire[d] their passion and their commitment to the issues they care about," with the money intended to be used by the protestors to buy dinner.[13]

28.    The protestors responded to President Shalala's appeasement by escalating their disruptions, taking over multiple parts of the campus and enforcing a "human blockade" in front of several entrances on campus to coerce TNS's board of trustees to pass a resolution to divest from companies allegedly connected to Israel.   On May 3, 2024, TNS finally requested that the NYPD sweep the encampment and arrest and remove the protestors.

29.    In response, a large number of TNS faculty and staff initiated a faculty encampment, the first such encampment in the nation.   Just as with the student protestors, the purpose of this faculty encampment was to impair TNS's educational activities until their demands were met, which yet again included a discriminatory boycott against Israelis and dismissal of all

---

[11] Biana Rodriguez-Mora and Rowan Cahill, *TNS SJP is currently occupying the University Center, demanding divestment and financial transparency from The New School*, The New School Free Press (Apr. 21, 2024), https://www.newschoolfreepress.com/2024/04/21/tns-sjp-is-currently-occupying-the-university-center-demanding-divestment-and-financial-transparency-from-the-new-school/.

[12] *Id.*

[13] *Id.*

charges against the student protestors who participated in the student encampment. An anonymous representative for the faculty stated, "The movement by our brave students must continue, and it is incumbent upon as us as faculty to heed their calls, and help finish what they started."[14]  Over 200 TNS faculty gathered to take a vote of no-confidence on President Shalala for using police assistance to end the student encampment's ongoing disruption of the university: 94% voted in favor.[15]

30.    From the beginning of the protest movement at TNS, faculty and staff were heavily involved with and supportive of the protestors' discriminatory, harassing, and disruptive activities, with the faculty encampment coming as only the most high-profile episode. As recognized by SJP, "None of this would be possible without faculty collaboration on every level. I am so proud to say that faculty are an integrated part of our process from the very beginning of SJP and far beyond it."[16]

31.    TNS did not take any actions to address the attempt by its faculty and other employees to coerce TNS into a discriminatory anti-Israeli boycott by disrupting educational activities.

32.    Due to TNS's refusal to take action against the faculty encampment, the protestors again escalated, taking over TNS's Welcome Center to again demand the board of trustees divest

---

[14] Patrick Reilly, *US' first faculty-led anti-Israel encampment created at New School*, New York Post (May 8, 2024), https://nypost.com/2024/05/08/us-news/faculty-led-anti-israel-encampment-erected-at-new-school/              .
[15] *Id.*
[16] Bianca Rodriguez-Mora and Alexiah Syrai Olsen, *Faculty at The New School has set up solidarity encampment*, The New School Free Press (May 8, 2024), https://www.newschoolfreepress.com/2024/05/08/faculty-at-the-new-school-has-set-up-solidarity-encampment/.

from companies allegedly connected to Israel.[17]  In taking over the building, students trespassed and fought with security guards.[18]

33.    Not only did TNS not take any action to address the protestors' conduct, it capitulated to their demands.  On May 20, 2024, TNS released a statement that the investment committee of its board of trustees would take a vote on or before June 14, 2024, on whether to completely divest from companies identified by the protestors.[19]  TNS directly stated that it was doing so based on calls from the protestors.[20]  TNS further stated, "The President commits that no community member will face disciplinary, professional, or other legal sanctions for being in the 72 Fifth Avenue encampment and the faculty encampment in the University Center."[21]

34.    The protestors continued their disruption into the summer.  During a welcome speech by TNS's new president, Joel Towers, on August 22, 2024, protestors repeatedly interrupted and prevented the speech from continuing, agitating in favor of the encampment protestors and their demands.  Protestors controlling the student senate voted on August 23, 2024, to suspend funding for all student organizations until their demands were met.  When TNS attempted to preserve funding for student groups, SJP blamed "Zionists" in TNS's administration for interfering with the protestors' efforts.

35.    In an interview published on September 26, 2024, protestors who had organized the encampments at TNS explained how TNS's approach to their disruptions meant that they were

---

[17] Bianca Rodriguez-Mora, *New School students and faculty occupy the Welcome Center*, The New School Free Press (May 14, 2024), https://www.newschoolfreepress.com/2024/05/14/new-school-students-and-faculty-occupy-the-welcome-center/.
[18] *Id*.
[19] *Statement of Agreement to Vote on Divestment*, The New School (May 20, 2024), https://blogs.newschool.edu/community-messages/2024/05/20/statement-of-agreement-to-vote-on-divestment/.
[20] *Id*.
[21] *Id*.

rewarded the more they disrupted.[22]  They detailed how they escalated their disruptions anytime TNS tried to make demands during negotiations, which consistently led to TNS capitulating and then agreeing to at least a portion of the protestors' demands.[23]  The protestors directly attributed their continuous escalation to TNS's refusal to punish them and its consistent surrender in the face of their conduct.[24]  They further explained that after the police closed down the student encampment, TNS's leadership was terrified of the ensuing critique from the protest movement and refused to take further action against the subsequent faculty encampment and building take-overs: "It was the fact that we were able to go again and again and again—across three buildings over the course of a month—that was crucial.  From the start, we knew the admin's tactic was to create stagnation and wait us out.  In response, our focus was on continuously not resolving the issue.  Combining escalation and negotiation allowed us to do that: to actively create a constant sense that the house is on fire."[25]

36.     As a result of the hostile environment against Jews and Israelis created by the protestors and their faculty allies, the nonprofit watchdog group Stop Antisemitism gave TNS an "F" on its 2024 Antisemitism on College and University Campuses Report Card, reflecting that TNS is one of the most anti-Jewish schools in the nation.[26]  The grade was based on how TNS enabled antisemitic protestors, failed to address hate-driven behavior on campus, and refused to

---

[22] A. Gopalan, *After the Encampments*, Jewish Currents (Sep. 26, 2024), https://jewishcurrents.org/after-the-encampments-gaza-university-divestment.
[23] *Id*.
[24] *Id*.
[25] *Id*.
[26] Barbara Russo-Lennon, *The New School earns failing grade from nonprofit for alleged failure to curb antisemitism*, AMNY (Nov. 19, 2024), https://www.amny.com/news/the-new-school-stop-antisemitism-failing-grade/.

include and protect Jews in its DEI programs, and on the results of a survey conducted of Jewish students at TNS which found the following:

- 75% of the students have experienced antisemitism;
- Only 50% of the students felt safe expressing their Jewish identity;
- 95% of the students did not feel welcome in many spaces on campus;
- 87% of the students felt they were personally blamed for Israel's actions;
- 87% of the students did not feel safeguarded by TNS;
- 83% of the students would not recommend TNS to others.[27]

In explaining TNS's failing grade, Stop Antisemitism's executive director stated, "The New School has utterly failed to protect its Jewish students, allowing harassment, exclusion, and violent antisemitism to thrive unchecked. Despite reports of discrimination, death threats, and open hostility, the administration has taken little to no meaningful action, abandoning Jewish students in their time of need."[28]

**II. Plaintiff White is subjected to an antisemitic, anti-Israeli hostile environment that The New School exacerbates and refuses to address.**

37.     Plaintiff White is one such student who was abandoned by TNS's administration in his time of need after he was assault, slurred, and prevented from attending classes by SJP, and then targeted by its members and allies in a retaliatory harassment campaign. Though White is not Jewish or Israeli, SJP protestors targeted him with antisemitic, anti-Israeli harassment based on their perception that he is. In line with TNS's systematic refusal to take any actions to address discrimination against Jews and Israelis on campus, TNS refused to investigate White's Title VI complaints against SJP protestors for months on end. While endlessly delaying investigation into White's complaints, TNS pursued a grievance process *against* White based on the readily-

---

[27] *Antisemitism on U.S. College and University Campuses: 2024 Report Card*, Stop Antisemitism 11 (2024) (available here: https://stopantisemitism.org/wp-content/uploads/2024/11/StopAntisemitism-College-Report.pdf).
[28] Russo-Lennon, *supra* note 26.

disproven, bad-faith claims of his harassers in SJP, while also refusing to take any action to protect White from their ongoing defamation and harassment campaign. Even when TNS finally investigated White's complaints, five months after he submitted them, it dismissed the matter without action, refusing to take any action to protect White from harassment, discipline his harassers, or otherwise address the discrimination.

**A. Brandon White is physically assaulted by SJP protestors on December 4, 2023.**

38.    On December 4, 2023, SJP, led by its then-president, "SD,"[29] blockaded the entrances to the University Center as part of its protest campaign. Assisting SD with the protest was his friend and ally in SJP, "VS", who works for TNS as a teaching assistant. The University Center's main entrance has inner and outer doors separated by a vestibule. The protestors formed a human wall blocking entrance through the inner doors. They forcefully resisted and pushed back any students attempting to access the building. In doing so, the protestors directly interfered with students' access to educational resources using unlawful physical force. Among the protestors were TNS students, staff, faculty, and outsiders. As attested to by TNS's Director of Security Operations, Michael Biondo, when campus safety officers opened an alternate entrance on 13th street, SD directed protestors to block that entrance, and when officers opened the Kerrey Street entrance, SD had those doors blocked as well.

39.    SD and SJP's blockade flagrantly violated TNS's Demonstration Guidelines, which state the following:

> Persons may not block or otherwise disrupt ingress and egress into and out of any facility that is owned or operated by the University or significantly impede the

---

[29] Neither of the two individuals who attacked and slurred White at the December 4th protest and led a discriminatory harassment campaign against him afterwards is directly named in this Complaint due to White's well-founded fear that they would further retaliate against him if he did so. They are referred to throughout the Complaint by the initials "SD" and "VS."

movement of people or disrupt regular or authorized activities in classrooms, offices, hallways, lobbies, studios, and laboratories.

Persons may not engage in any conduct that violates fire and building codes or any other code and regulation for public safety.  Similarly, persons may not engage in any conduct that violates the university's policies and procedures, including the Code of Conduct, as well as any federal, state or local laws.

Their conduct additionally violated TNS's policies regarding 1) disorderly conduct, 2) bias related conduct, 3) harassment, 4) disruptive, threatening, and abusive behavior, and 5) blocking entries or exists.  In addition to TNS policies, the protestors violated NY Penal Law § 240.20, which prohibits disorderly conduct intentionally causing public inconvenience, annoyance, or alarm by disturbing any lawful assembly or meeting of persons.

40.    SD was also personally abusive to Officer Biondo during the protest.  At one point during their interactions, SD asked Officer Biondo whether Biondo would help the protestors by removing people attempting to access the University Center for their classes.  Officer Biondo replied that campus safety officers are not authorized to physically remove anyone.  SD then insulted Officer Biondo, telling him, "You're just a piece of shit."

41.    At around 2:00 PM, as SD and SJP's protest was ongoing, Plaintiff Brandon White arrived at the University Center to attend one of his classes in preparation for upcoming final exams.



*Screenshot from security camera footage from December 4, 2023, depicting the vestibule of the University Center. The inner doors blocked by the protestors are to the left; the outer doors are to the right. Plaintiff White, wearing a white jacket and a black Yankees hat, is indicated by the red oval.*

42.     When White entered the vestibule, he attempted to open one set of the inner doors to get inside the building but was blocked from moving through by SD, who yelled at him and forcefully shoved him back. White attempted to move past SD and the protestors but was forcefully shoved back again.



*White attempts to enter the inner doors and is forcefully stopped by SD, who thrusts his arm into White.*



*White attempts to move past SD; SD physically accosts him.*





*SD shoves White back and through the door.*

43.    After being violently shoved back twice by SD, White attempted to enter the building through a second set of doors.  VS was with the protestors behind these doors.  When White opened one of the doors, VS surged forward to shove White back while screaming in his face.





*White moves to the second set of doors to attempt to enter the building.*



*White opens one of the doors while a faculty protestor shouts at him.*



*VS rushes forward, arm extended, shoving White back.*





*White is pushed back and observes the situation while VS slams the door shut.*

44.     White then attempted to enter the second set of doors again.  The faculty protestor again screamed in White's face as VS and other protestors forcefully pulled the door closed while White's hand was grasping the handle, violently wrenching his shoulder forward.

22



*White attempts to open the door again.*



*The faculty protestor shouts in White's face.*





*VS and other protestors forcefully pull the door shut, violently pulling the handle out of White's hand.*

45.    After VS and other protestors blocked White from entering through the second set of doors, White stood in the vestibule to consider his options for what to do next.  With his

upcoming finals, it was particularly important to White to attend his classes that day, which the protestors were making impossible.

46.     At this moment, SD entered the vestibule to continue accosting White, angered that White attempted to enter the University Center.  SD walked over to White aggressively, coming uncomfortably close while yelling at him and swinging his arm near White's face with his phone in hand.  Based on SD, VS, and the other protestors' aggressive conduct—which already included screaming in his face and using violent physical force to shove him repeatedly—White reasonably feared that SD was swinging his phone near White's face to hit him and reflexively pushed away SD's hand.  SD then forcefully thrust his arm into White to shove him out of the building while yelling antisemitic slurs at him.  Though White is not Jewish or Israeli and had no prior involvement with politics or activism related to the Israel-Palestine conflict, SD shouted at White that he was a "Zio"—short for "Zionist" and a derogatory euphemism for "Jew"—intending to slur him based on SD's perception that White is Jewish and/or Israeli.

47.     After SD shoved White outside, White immediately began to walk away from the building, but SD continued pursuing him to yell further antisemitic slurs at him; SD was then joined by a friend in taking photographs of White that SD and his allies would subsequently use to harass and retaliate against White.  As White was walking away, SD and his friend shouted threats, saying, "I will have you arrested," and that White would be "found."





*SD enters the vestibule and approaches White to accost him.*





*SD moves toward White, swinging a hand with his phone near White's face. White reflexively pushes away SD's arm. The successive images from the footage reflect that SD was moving toward White as this happened, while White remained still other than his reflexive arm movement to block and push away SD's swinging phone.*



*SD violently shoves White through the doors, out of the building.*



*Onlooking students in the vestibule react in shock and alarm to SD's assault on White. SD visibly still has control of his phone.*





*SD pursues White outside to continue yelling at him and to take photographs of him for later use in smearing and retaliating against White.*





*White walks away as SD continues pursuing White, yelling antisemitic slurs at him and taking photographs of him.*

48.    SD returned to the vestibule twenty seconds later as White continued walking away

from the area.  Once back in the building, SD resumed command of the SJP protest that was

30

blocking access to the building, guiding the protestors in preventing other students from accessing educational resources in the name of anti-Israel activism.

49.     Over the next two minutes, SD personally accosted two other students and prevented them from entering the building.  SD violently shoved one of them back before thrusting his phone in the student's face to photograph him, similarly to what he had done with White.



*Student in black jacket and brown backpack (blue oval) attempts to enter the University Center.*



*Protestors prevent the student from entering the building while SD rushes over.*



*SD shoves the student aside and rejoins the protest line.*



*Student puts her hands up in shock and disbelief after SD and the protestors forcefully shove her out of the entrance.*



*Another student (wearing a grey shirt and a black backpack) attempts to enter the building while SD personally blocks him from doing so.*



*The student attempts to move around SD to enter the building.*





*SD aggressively shoves the student back.*



*The student attempts to speak with SD.*



*SD again forcefully shoves the student back.*



*SD thrusts his phone in the student's face to take a picture of him.*

50.     As a result of SD's assault against White and SJP's blockade of the University Center, White was unable to attend his class.  Soon after leaving the University Center, White contacted the teacher for the class he had missed, asking her whether the class could be conducted over Zoom.[30]  The teacher replied that doing so was not possible.[31]  White explained to the teacher that he had been assaulted as he had tried to enter University Center for the class and requested that he be excused for not attending.[32]  The teacher agreed to excuse his absence, acknowledging that the SJP blockade had significantly interfered with academic function: "[T]here was a major obstruction so it is definitely okay that you didn't make it in!"[33]

**B.  SD's discriminatory, harassing conduct against other students.**

---

[30] Correspondence attached as Exhibit A.
[31] *Id.*
[32] *Id.*
[33] *Id.*

51.      In addition to SD's above-described harassment against White and other students, SD was recorded using a bullhorn at the protest to shout at Jewish students trying to enter the University Center and curse them out, yelling, "fuck you and fuck Israel," to them, and leading groups in chanting, "all Zionists go to hell."  SD also chased after a visibly Jewish student walking near the University Center, shouting, "You! Get out of here!"  As indicated by these discriminatory acts and how SD targeted and insulted White as a "Zio" based on White's appearance, SD used "Zionist" as a term of opprobrium for Jews and Israelis.  This targeted discrimination against Jews comports with the experience of a prospective student from Israel who was visiting TNS to finalize her decision on whether to attend during the December 4th protest.  She attempted to speak with some of the protestors about their advocacy but was met with discriminatory comments that convinced her that her life would not be safe at the New School.[34]

52.      SD and the protestors' conduct of hurling antisemitic abuse at students and use of force to obstruct their access to education based on their actual or perceived identity as Jews violated Title VI and New York State and New York City human rights laws and created a hostile educational environment.  SD, VS, and their allies further violated these laws by retaliating against White for attempting to enter the University Center and objecting to their obstruction of his access.

**C.  SD and VS start a retaliation campaign against White "to ruin his life."**

53.      Following the protest, SD and VS put the photos SD and his friend took of White to use, making good on the threat that White would be "found."  SD posted one of the photographs his friend took of White after SD shoved him outside the building to his Instagram account.  In the

---

[34] Olivia Young, Bianca Rodriguez-Mora, Remy Grimm, Aarya Kini, J. Cav Scott, *Inside the SJP Walkout for Palestinian Liberation: a closer look at Monday's student action in the UC*, New School Free Press (Dec. 7, 2023), https://www.newschoolfreepress.com/2023/12/07/inside-the-sjp-walkout-for-palestinian-liberation-a-closer-look-at-mondays-student-action-in-the-uc/.

post, SD repeated his antisemitic slur against White and falsely accused White of punching him and calling him a slur:



SD's call for others to share and repost was rapidly picked up by his allies, who began spreading the false accusations against White and added onto them.

54.     VS worked with SD to further spread the false accusations against White and start a campaign to find White and "ruin his life:"



55.    VS soon after discovered White's name and Instagram account and shared them in an Instagram post calling for SD's allies to mass report White to The New School to get him expelled:



VS also encouraged others to go to White's social media accounts to harass and defame him further:



56.    Over the subsequent weeks and months, SD and VS's friends and allies responded to the call to ruin White's life, spreading the false accusations about White being a bigot and punching SD across the internet, and harassing White and his girlfriend on social media:



They also began interfering with White's business contracts, attempting to get them canceled based on SD and VS's falsehoods.  An example of this attempt to harm White's professional life is the below comment directed at the shoe brand Steve Madden, which White was working with:



**D.  The New School responds tepidly to the December 4th protests.**

57.     In response to the protests, TNS published two statements.  The first was a campus-wide message stating that a group of 100 students had gathered in the University Center and other facilities to block entry into the buildings despite "being informed this was in clear violation of campus policies for demonstrations and the Student Code of Conduct."[35]  The second was a "Notice of Policies" statement that TNS disseminated to the protestors, informing them that blocking the entrances into the University Center violated TNS's Demonstration Guidelines.  The Notice specifically stated that "students obstructing access to others and/or noncompliant in presenting ID … will be subject to sanction as outlined in the Student Code of Conduct," ranging "from warning to expulsion based on a conduct hearing's deliberations and findings."

58.     Despite the language in these statements, TNS took no action against any of the protestors or against SJP for their blatant policy violations.

**E.  White reports the assault incident to The New School.**

---

[35] Messages to the Community, *Demonstrations on Campus*, The New School (Dec. 4, 2023), https://blogs.newschool.edu/community-messages/2023/12/04/demonstrations-on-campus/.

59.     On the evening of December 4, 2023, White reported SD's assault against him directly to TNS's president, Donna Shalala, and provost, Renée White via email.[36]  In the email, White described the assault in detail, informing President Shalala and Provost White of how he had attempted to enter the University Center to attend classes but was blocked by protestors who had blockaded the main entrance.  He informed them that he was violently shoved out of the building and pursued across the street by protestors who recorded him and verbally threatened him.  He stated how the assault made him fear for his safety and interfered with the education he had expended considerable resources to pursue:

> I understand and respect the right to peaceful protest, but the nature of this encounter raises significant concerns regarding student safety and access to educational facilities. The inability to enter a building for a scheduled class, especially during finals week, impedes my academic pursuits, for which I have invested significant time and finances. Furthermore, this incident has left me feeling unsafe on campus. The thought of what could have happened if there were a severe emergency and nobody could enter or exit the building is deeply troubling. The administration must ensure such a situation never occurs again.[37]

He closed his email stating that he was "open to discussing this matter further and providing any additional information needed" and that President Shalala and Provost White's "attention to this matter is greatly appreciated."

60.     To ensure that the assault and his concerns about his physical safety and access to education were known and addressed, White sent an identical message to other lead administrators at The New School: Senior Director for Campus Safety and Emergency Management Thomas Iliceto; Executive Dean of Parsons School of Design Yvonne Watson; then-Manager of Academic

---

[36] Correspondence attached as Exhibit B at 1.
[37] *Id*.

Advising Wen Yu Wang; and Dean of the School of Undergraduate Studies at the Schools of Public Engagement Kate Eichhorn.[38]

61.    Dean Eichhorn quickly responded, acknowledging that White "was not the only student who was impacted" by the December 4th protests and stating that "no student should ever feel intimated [sic] attempting to enter a building to attend a scheduled class."[39]

62.    Wang responded the following morning, on December 5, 2023, that that TNS "take[s] your concerns about safety and accessibility on campus very seriously" and stating that White could book an advising meeting if he wished to discuss the matter further.[40]

63.    White thanked Wang, Iliceto, Watson, and Eichhorn for the responses, but emphasized that he was concerned about TNS's handling of the assault and the blockading of the University Center.[41]  White described how the administration's decision to respond to the disruptive protests on December 4th with only a school-wide email did not "address the underlying issues with the seriousness they deserve" and how the right to express beliefs "should not extend to actions that impede access to educational facilities."[42]  White raised the issue of how TNS's failure to meaningfully respond to disruptive student protests that interfered with classes directly harmed his education and career development:

> This issue is especially urgent for me, not just due to the physical confrontation I experienced at the building, but also because I am in the midst of preparing for a pivotal professional engagement – an exhibition at Art Basel in collaboration with a renowned family. The effort to juggle this alongside my academic obligations has been extraordinarily challenging. This semester has seen me diligently balancing a demanding in-class schedule with significant external commitments. The process of obtaining permission for class absences to facilitate this crucial career opportunity.

---

[38] *Id*. at 3.
[39] *Id*. at 3-4.
[40] *Id*. at 4.
[41] *Id*. at 4-5.
[42] *Id*.

Contrasting this with the ease with which classes were canceled due to the actions of students obstructing access to the building, which is a clear violation of the school's code of conduct, raises serious questions. It seems to suggest a discrepancy in how the school weighs the importance of adhering to academic responsibilities against the consequences of student misconduct. This disparity is particularly glaring in light of the message it sends about the school's priorities and its stance on student conduct and professional growth.[43]

64.    Dean Watson responded, assuring White that the administration was "taking [his] concerns very seriously" and that it "do[es] not condone acts of incivility amongst our student body" and that it would "be looking into this further."[44]

65.    Also on December 5, 2023, President Shalala's Office responded to White's email, thanking him for reaching out and stating that his complaint about the assault and interference with his education had been forwarded to Student Conduct and Community Standards for review.[45] Shalala's Office referred to the campus-wide message concerning the protests that the administration had published the previous day and stated that "[t]he university will be attentive to other demonstration activities to ensure safe access to all campus spaces for all students, faculty, or staff members attending their classes and completing their work."[46]

**F.  The New School launches an investigation against White but not against SD.**

66.    Following White's communications with TNS's leadership to inform them of the assault against him and his concerns about discriminatory interference with his education, TNS did not open up an investigation into SD or SJP.  Despite the statement from President Shalala's Office that they had forwarded White's complaint to the Office of Student Conduct and

---

[43] *Id*.
[44] *Id*. at 5
[45] *Id*. at 2.
[46] *Id*.

Community Standards for review, no investigation was launched; instead, it was White who subjected to an investigation based on SD's and VS's complaints against him.

67.    In further retaliation against White for attempting to enter the University Center and objecting to their discriminatory interference with educational resources, SD and VS filed bad-faith, false claims against White based on easily-disproven accusations.  On December 7, 2023, Plaintiff White received two emails from the TNS's Student Title IX Investigator, Cassita Charles-Bowie.[47]  The first email stated that TNS was investigating White based on a complaint from SD that White had "engaged in hate speech, discrimination based on sex/sexual identity and physical assault" against him:

> [SD] has alleged that on 12/4/23 at around 2pm at the UC, you attempted to break through the doors to get through the protestors despite the fact that an alternate entrance was available with the goal of intimidating protestors and enacting violence on the demonstrators. [SD] also alleged that you called them and another student "faggots" and that after you were able to yank the door open, you punched them in the face while calling them a "fucking faggot". [SD] stated that you called another organizer a tranny while attempting to punch her as well, missing the punch. [SD] also stated that you told him to kill himself, called him a "fat faggot" and that he should die in Gaza. It was then alleged that after you left the UC, you saw [SD] taking pictures and that you grabbed their phone violently from their hand and threw it on the sidewalk.[48]

The second email stated that White was being investigated for similar conduct against VS:

> [VS] has alleged that on 12/4/23 at around 2pm at the UC, she witnessed you punch a queer person right in front of her at the UC inner doors soon after calling said queer person a "faggot" and that he [sic] also grabbed this queer person's phone and threw it on the sidewalk and that when she tried to intervene on that queer person's behalf, you also tried to punch her, called her a "faggot" and muttered something with the word "tranny" under your breath as you walked away.[49]

---

[47] Correspondence attached as Exhibit C.
[48] *Id*. at 1.
[49] *Id*. at 7-8.

68.     Both SD and VS's complaints were readily disproven by the security camera footage of the assault incident at the December 4, 2023, protest.  SD and VS claimed White punched SD in the face when SD blocked White from going through the inner doors, and that he then tried to punch VS and missed: the security camera footage shows that the only aggression that occurred was SD, VS, and other protestors repeatedly shoving White.  SD and VS also claim that White grabbed SD's phone and threw it on the sidewalk, but the footage shows that SD retained control of his phone after shoving White out of the building and after returning from pursuing White outside to harass him further.  Review of the security camera footage of the assault incident would thus show TNS that SD's and VS's claims were facially false and retaliatory.

69.     This was not the first time that SD had discriminatorily targeted and retaliated against another student based on Jewish/Israeli identity by making false complaints to TNS of transphobia and racism.  SD brought similar false claims against other students as part of a pattern of harassment targeting Jews and Israelis, including against a student he had never met.  SD's propensity for false and retaliatory claims was thus known to TNS.

70.     Charles-Bowie's emails about the complaints stated that White would need to meet with her and her colleague Shannon Schmutz for an interview.  At the bottom of the emails was a link to TNS's policy on harassment, discrimination, and Title IX, and a statement of its retaliation policy:

> We have a strict retaliation policy that prohibits threats or other forms of intimidation against any member of the university community who exercises their right to initiate a complaint or inquiry in good faith regarding a sexual misconduct, harassment, domestic/ dating violence or stalking concern, or discrimination in the form of bias and/or microaggressions. Retaliation includes intimidating, threatening, disparaging, coercing or in any way discriminating against an individual as reprisal for the individual's complaint or participation in an investigation or proceeding whether verbally, physically or through social media.

> We would respond to any retaliation concerns immediately. You are also protected
> under this policy as retaliation against you for providing your statement as well.[50]

The emails stated that TNS "would respond to any [of White's] retaliation concerns

immediately" and that White was "also protected under this policy as retaliation against

you [sic] for providing your statement as well."

71.    Charles-Bowie's emails also informed White that TNS offered him several

"supportive measures" should he need them during the grievance process:

> Supportive measures will also be offered to you. Supportive measures are non-
> punitive, non-disciplinary measures offered as appropriate, as reasonably available,
> and without fee or charge to the complainant or respondent before or after the filing
> of a formal complaint or where no formal complaint has been filed:
> - Counseling,
> - Requests for extensions of deadlines or other course-related adjustments, which
>   are granted at the professors' discretion[,]
> - Modifications of work or class schedules,
> - Campus escort services,
> - Mutual restrictions on contact between the parties,
> - Changes in work or housing, locations,
> - Leaves of absence,
> - Increased security and monitoring of certain areas of the campus, and
> - Other similar measures.[51]

As later events would show when TNS denied White's request for protection and escort services

after SD and his SJP allies unlawfully occupied the University Center with an encampment—

causing White to fear for his safety on campus—TNS's offer of these "supportive measures" was

disingenuous and it was unwilling to fulfill them if it meant taking any action, no matter how small,

against the unlawful and policy-violating anti-Israel protest movement.

72.    Attached to the email concerning SD's claim was a No-Contact order prohibiting

White and SD from contact with one another "either on or off campus, in person or through another

---

[50] *Id*. at 2.
[51] *Id*. at 1-2.

party, by telephone, email, or other electronic media, or by any other means."[52]  The order stated

that White and SD "may not engage in indirect communications via social media or any other

means" and "must refrain from any form of harassment, retaliation, or intimidating behavior."[53]

The order warned that violating its restrictions "may result in disciplinary consequences."[54]

73.    Plaintiff White responded to the notice of SD's complaint against him, copying

President Shalala and Provost White.[55]  Plaintiff White stated his intent "to fully cooperate with

the investigative process" and addressed several points concerning SD's complaint and TNS's

investigation process:

- SD's accusations were entirely false and placed White under considerable distress, including by feeling unfairly targeted and threatened.

- The incident in dispute occurred amid an unauthorized demonstration by protestors that directly violated TNS's student conduct policies.

- The narratives put forth by SD and VS were inconsistent and intended to defame White.

- The New School Free Press was intending to publish an interview with SD and VS which would potentially prejudice the investigation and damage White's reputation.

- Due to the serious nature of the accusations, White was requesting that The New School secure and preserve all security camera footage from the location and time of the incident on December 4, 2023, around 2pm.[56]

White closed his response expressing that he was deeply troubled by the implications of SD's

complaint and TNS's response, and how it potentially reflected tolerance for antisemitism.[57]

---

[52] *Id*. at 6.
[53] *Id*.
[54] *Id*.
[55] *Id*. at 3.
[56] *See id*. at 3-4.
[57] *Id*. at 4.

74.    White followed up later on December 7, 2023, to emphasize his "deepening concern and dissatisfaction with how the school [was handling] the ongoing situation:

> Since my last correspondence, the issue has escalated further. [SD] has continued to defame me on social media, making false allegations of physical and verbal assault. This accusation is not only baseless but also damaging to my reputation and mental well-being. Moreover, I have been informed that an **article is being written about me that's being published tomorrow**, based on these false claims. The school's previous response, while acknowledging the situation, has not adequately addressed the severity of these actions. The measures taken seem superficial in light of the gravity of the accusations against me and the clear violation of the school's code of conduct by the students blocking the school entrance.
>
> I must emphasize that falsely accusing someone of a crime is a serious legal matter. These unfounded claims against me constitute slander and could be subject to legal action. I urge the school to consider the legal implications of allowing such behavior to go unchecked.
>
> I appreciate your immediate attention to this urgent matter. To facilitate a swift resolution, I request an urgent meeting to discuss these issues in person. Could you please provide a contact number to arrange this as soon as possible?[58]

75.    The article in question was published in the New School Free Press on December 7, 2023, and reported false claims by SD and VS that a "counter-demonstrator"—White—had "attempted to 'swing at'" SD, pushed him back toward the door in the University Center vestibule, and called him a homophobic slur, and then attempted to "swing at" VS as well.[59] Notably, SD's version of events in the article differed from his claims in his complaint against White to TNS, stating in the article that White had only "attempted" to hit him, while stating in his complaint that White had actually made contact. SD's and VS's false statements in the article are directly contradicted by the security camera footage, which shows that White had not, as SD claimed

---

[58] Correspondence attached as Exhibit D.
[59] Olivia Young, Bianca Rodriguez-Mora, Remy Grimm, Aarya Kini, J. Cav Scott, *Inside the SJP Walkout for Palestinian Liberation: a closer look at Monday's student action in the UC*, New School Free Press (Dec. 7, 2023), https://www.newschoolfreepress.com/2023/12/07/inside-the-sjp-walkout-for-palestinian-liberation-a-closer-look-at-mondays-student-action-in-the-uc/.

grabbed SD's phone and thrown it on the ground in an attempt to prevent his photo from being taken.

76.    Prior to publication, The New School Free Press had reached out to White for comment. Given the sensitive nature of the situation, the ongoing investigation, and TNS's failure to protect him or take action so far, White declined to provide a statement out of concern that it would be misrepresented.  Despite White declining to provide a statement and the concerns White stated to TNS administrators about the article prejudicing the investigation, The New School Free Press went forward with publishing the article.  Although White was not named directly in the article, it contained enough identifying detail to associate White with false allegations of physical and verbal misconduct in the minds of many readers, who would know that the article was referring to him because SD, VS, and their allies had already begun to publicize their defamatory claims online about White.

77.    Though White had made TNS explicitly aware of his concerns about the article and the risk of damage to his reputation and wellbeing before it was published, TNS failed to step in, issue a clarifying statement, or take any other action to protect White from harm.  TNS's failure to act was particularly egregious because it had imposed the No-Contact order on White and SD, yet was allowing SD and VS to use media operating under TNS's name to spread false and prejudicial narratives about the active investigation and to continue defaming White within the TNS community and beyond.

78.    The article's circulation on campus and social media significantly contributed to the hostile environment White experienced and amplified the social, emotional, academic, and professional harm he suffered; it involved TNS directly in spreading false information about

White, prejudicing the investigation, and reinforcing the climate of hostility, exclusion, and personal attacks against White at TNS.

79.     The stress of the assault incident and SD and VS's harassment campaign against White severely disturbed him and interfered with his academic and professional work.  White was fearful of harassment, stalking, intimidation, and generalized hostility against him on campus as a result of the defamatory posts SD, VS, and their allies spread about him—which was exacerbated by The New School Free Press's article repeating their false claims—and was worried he could be attacked again.  Late on December 7, 2023, White received an email from one of his professors, Robert Rabinovitz, expressing surprise that White had come to class late and left early, particularly in light of the professor's request to meet with White to discuss his coursework.[60]

80.     White responded, describing the assault incident and the false accusations against him and that he had been slurred based on his perceived Jewish identity, thereby providing actual notice to TNS through Professor Rabinovitz that he had been harassed and threatened based on the perception that he is Jewish.  White explained:

> I am currently dealing with false allegations toward me from the day of the pro Palestine walkout/barricade at the entrance at the new school. I was targeted as jewish called a zionist. I feel very threatened at this school right now. I feel very bad for what's going on towards the jewish community. Not only do I know how my friends feel, I learned first hand. I have a school hearing. They want to hear both sides of the story tomorrow. I just can't believe how people can live with making false allegations that can impact someone like this.[61]

81.     As a result of the stress and disruption, White was also unable to complete his coursework for Professor Rabinovitz for the end of the semester on the original deadline and needed to arrange with Rabinovitz and a TNS administrator for an extension of several days.[62]

---

[60] Correspondence attached as Exhibit E at 1.
[61] *Id*.
[62] *Id*. at 2.

82.    Also on December 7, 2023, Eichhorn sent White an email asking if anyone from the Provost's Office or the President's Office had reached out about his concerns, offering to connect White with them if not.[63]

83.    On December 8, 2023, White responded to Eichhorn that he was in touch with the Provost's Office and that he had been informed that the Office of Student Conduct and Community Standards was reviewing his concerns but that he still had unaddressed concerns about the investigation against him and the ongoing conduct of SD and his allies:

> [T]here is an aspect of this situation that is particularly disconcerting. I find myself unjustly embroiled in an investigation due to baseless accusations from two students involved in an illegal protest at our school, falsely accusing me of physical assault and inappropriate remarks.
>
> Adding to my anxiety, I was notified via Instagram DM about an article set to be published by 4:00 pm today from the New School Press based on these unfounded allegations. This development, amidst an ongoing investigation and despite a no-contact order with the involved students, not only heightens my sense of vulnerability but also my fear of a concerted effort to ruin my reputation and life. The situation is made more alarming by the fact that there are cameras at the site of the incident which I am confident will corroborate my account and demonstrate my innocence.
>
> I am deeply troubled by what seems to be the school's hinted support of these students, who have actively impeded others from attending classes and preparing for finals. It appears that the school is inadvertently condoning actions that disrupt the academic process and the rights of other students. This entire episode has left me feeling severely threatened and unfairly targeted at the New School. It has become an incredibly unsettling experience, aligning with the discrimination and unjust treatment that others, including my Jewish friends, have endured within our community.
>
> I am grateful for your offer to communicate with the university leadership on my behalf and am urgently awaiting a prompt and equitable resolution to this matter, which now threatens to irreparably damage my life and future.[64]

---

[63] Correspondence attached as Exhibit F.
[64] *Id*. at 1.

84.     White's message to Eichhorn stated that he had been subjected to harassment based on the perception that he is Jewish and/or Israeli, explaining that the conduct against him "align[ed]" with the discrimination and unjust treatment" that his Jewish friends had endured at TNS.

85.     Eichhorn offered to forward White's message with his concerns to the President's Office and to meet with White regarding them.[65]   Eichhorn and White met later over Zoom on December 8, 2023, during which Eichhorn offered White reassurance.

86.     During White's meeting with Eichhorn, he directly stated to her that he had been targeted, harassed, assaulted, prevented from attending classes, and subjected to a campaign of retaliation, defamation, and false accusation due to his harassers' perception that White is Jewish and/or Israeli. White also explained to Eichhorn that he did not understand why TNS was allowing the discriminatory harassment against him to happen while simultaneously bringing investigations against him by his harassers. White pleaded with Eichhorn for TNS to intervene to protect him and to hold his harassers accountable.

87.     On information and belief, as one of TNS's undergraduate Deans, Eichhorn had the authority to take action to address the discrimination against White.

88.     On December 10, 2023, Eichhorn informed White that she had shared his concerns with her direct report on TNS's leadership team and strongly urged that someone in leadership reach out to White and discuss the assault incident.[66] Eichhorn's message reflects that TNS had actual notice of White's complaints about the discriminatory harassment against him based on his harassers' perception that he is Jewish and/or Israeli.

---

[65] *Id*. at 2.
[66] *Id*. at 4.

89.     Despite TNS having actual notice of the discrimination directed against White based on his perceived identity, White continued to suffer harassment without any effort by TNS to intervene for White's protection, with SD and his allies making social media posts that featured White's face and name and directing their network to file false reports against White to get him expelled, alongside continued use of the discriminatory slur, "Zio." This discriminatory harassment organized by SD and his allies continued for months after TNS's actual notice of the discrimination against White until at least February 2024.

90.     On December 11, 2023, Charles-Bowie acknowledged receipt of White's email from December 8th and asked to schedule a meeting with him and his advisor.[67]  Charles-Bowie did not acknowledge or address any of White's concerns from his December 8th email.

91.     White responded to Charles-Bowie to reiterate his request for the security camera footage of the assault incident.[68]

92.     On December 12, 2023, Charles-Bowie replied to White, stating that she and her colleague Shannon Schmutz would discuss how to obtain the security camera footage, and the rest of the investigation process, when White and his advisor met with them, but that "any requested video footage would have to be subpoenaed."[69]  Charles-Bowie soon followed up again to state that both White and SD "would also receive any surveillance footage as part of the investigative report to review during the formal grievance process."[70]  Charles-Bowie did not provide an explanation for why the security camera footage would require a subpoena if it was in TNS's

---

[67] Correspondence attached as Exhibit G at 1.
[68] *Id*. at 1.
[69] *Id*. at 2.
[70] *Id*. at 3.

possession and control and would be vital to the investigation, nor why she then contradicted herself regarding that point.

93.    Despite White's attempts to get answers from Charles-Bowie about the hearing process for his and SD's complaints—White did not know at this time that TNS had not yet opened an investigation into his complaints—including a timeline for when interviews and the ultimate hearing would take place, Charles-Bowie either refused or was unable to give answers, claiming that the Office of Student Conduct & Community Standards would be conducting the hearing portion of the grievance process.[71]  Charles-Bowie also refused White's requests for a timeline for when the investigative report and surveillance footage would be provided and refused to provide a list of security personnel on duty at the University Center at the time of the incident.[72]

### G.  The grievance process stalls in January and February 2024 due to lack of professionalism and diligence by TNS administrators.

94.    White attempted to keep the pace of the grievance process moving swiftly.  At White's insistence, Charles-Bowie and he met on December 20, 2023, so that the investigation process could continue proceeding. During this meeting, White explained to Charles-Bowie what had happened at the December 4, 2023, protest, including the discriminatory harassment and the assault against him based on the perception that he is Jewish and/or Israeli.

95.    Despite White's attempts to keep the investigation moving, it was repeatedly delayed due to unprofessionalism by TNS's administrative staff.  White attempted to get a status update from Charles-Bowie multiple times during the month of January 2024 but received no information and no response.

---

[71] *Id*. at 4.
[72] *Id*.

96.     It was only on February 5, 2024, that Charles-Bowie responded to White's repeated inquiries to inform him that she had been on jury duty for the month of January.[73]  She claimed that she would have a preliminary report for White's review within the next week.[74]  There was no apparent reason why the investigation was not transferred to another administrator who did not have external commitments that required putting the investigation on hold indefinitely, nor why this delay had not been communicated to White.

97.     On February 6, 2024, White sent Charles-Bowie his formal response to SD's allegations against him.[75]  White's response included his explanation of what occurred during the assault incident and a thorough description of subsequent discriminatory and retaliatory conduct by SD, VS, and their friends and allies, including the defamatory and bigoted statements on social media explicitly intended to ruin White's life and career.  White explained how SD and VS's conduct was harming him mentally, emotionally, and professionally.  White again explained how SD and the protestors had violated TNS's policies on demonstrations by blocking access to the University Center and thereby both interfering with White's and others' access to education and threatening their safety.  Attached to White's formal response was evidence of the offending social media posts, the article from The New School Free Press repeating SD and VS's false and defamatory accusations against him, and the notice TNS had distributed to protestors on December 4, 2023, in which TNS acknowledged that the protestors were violating its policies by blocking access to university buildings.[76]

---

[73] Correspondence attached as Exhibit H.
[74] *Id*. at 1.
[75] *Id*. at 2-9.
[76] *Id*. at 5-9.

98.    Though Charles-Bowie stated she would send White a preliminary report within a week, she failed to do so and went silent yet again; and despite Charles-Bowie's promise in her December 7, 2023, email that White was protected under TNS's retaliation policy and that TNS "would respond immediately" to any retaliation against White, neither she nor anyone else at TNS responded to White's complaints and evidence concerning SD and VS's ongoing antisemitic retaliation campaign to ruin White's life, in direction violation of the No-Contact order, TNS's retaliation policy, and Title VI.

99.    On February 21, 2024, after more than two weeks of silence from Charles-Bowie, White followed up with Charles-Bowie, Dean Watson, Assistant Dean Hosking, and Schmutz regarding the preliminary investigative report.[77]   White stated several of his concerns regarding the report:

- The report relied on conflicting testimony without sufficient corroborating physical evidence.

- The report failed to include all relevant narratives of the incident, including the narrative detailed in The New School Press by SD, which would be necessary for a balanced and fair assessment of what happened.

- The report conspicuously omitted all mention of school policy violations by SD and his compatriots.   The report contained SD's admission that he actively blocked a school entrance to interfere with university function and students' access to education, which constitutes a direct Title VI violation when coupled with SD's discriminatory conduct against White based on his perceived Jewish and/or Israeli.   By failing to address this aspect of the incident and SD's conduct, the investigation's integrity was undermined.

- The report was missing any statement or report from campus security Officer Mike Biondo, who witnessed the incident.[78]

---

[77] Early-stage investigative report attached as Exhibit I.
[78] *See* correspondence attached as Exhibit J at 1.

White again requested access to the surveillance footage, which Charles-Bowie had stated on December 12, 2023, would be provided to him.[79]  White also noted that TNS had taken no action regarding SD and VS's use of social media to defame White and attempt to ruin his life by spreading falsehoods and insults related to the incident.[80]  White stated that SD's use of social media to publicly disseminate a narrative before the conclusion of the grievance process was not only inappropriate but appeared to be influencing public opinion and the investigation's direction.[81]  White closed the email with a request for an update on the availability of the surveillance footage, a report or statement from Officer Biondo, and clarification on how the investigation would address SD's apparent policy violations and his ongoing actions targeting and retaliating against White.[82]

100.   On February 22, 2023, Charles-Bowie responded, claiming that the investigation team was still reviewing the surveillance footage—even though it had already had had over two months to do so.[83]  Charles-Bowie ignored White's concerns about SD's conduct at the December 4th protest, claiming that it was an issue handled separately by Student Conduct & Community Standards—which had still never addressed or responded to any of White's complaints about the assault incident.  Charles-Bowie also contradicted the terms of the No-Contact order, claiming that TNS could not "prohibit a student from posting on social media regarding a complaint," despite the order stating that SD and White were prohibited from "any form of harassment, retaliation, or intimidating behavior," including indirectly via social media or other means.[84]

---

[79] *Id*.

[80] *Id*.

[81] *Id*.

[82] *Id*.

[83] *Id*. at 2.

[84] *Id*.

101.    White responded to Charles-Bowie's email, copying Watson, Hosking, and Schmutz, to reiterate his concern that he had been denied access to the University Center due to SD and other protestors' assumption that he is Jewish, and that this targeted interference with White's access to educational resources based on perceived identity raised concerns about Title VI violations.[85]  White again urged TNS to address this apparent Title VI violation in its investigation. White also urged that the investigation address SD's coordinated harassment campaign against White.  White described how SD and his allies' harassment and defamation campaign targeted White's professional opportunities, such as by sending defamatory messages to companies that White was working with like Steve Madden, and how they were spreading false narratives about White being Islamophobic and homophobic.[86]  White stated that SD and his allies' ongoing discriminatory conduct was fostering a hostile environment for White at TNS.[87]

102.    White received no response to this email asking TNS's leadership to address the hostile environment SD and his allies were subjecting White to.

103.    As the grievance process dragged on and TNS continued its refusal to take any action to enforce the No-Contact Order, protect White from the retaliatory harassment campaign, or investigate his Title VI claims, White continued to suffer severe stress and disruption to his academic and professional work.  As a result of the stress and fear White felt when visiting campus, he was unable to attend one of the scheduled workshops for one of his classes and was delayed in submitting coursework.[88]  White was forced, yet again, to rely on the graciousness and

---

[85] *Id*. at 3-4.
[86] *Id*.
[87] *Id*. at 4.
[88] *See* correspondence attached as Exhibit K.

understanding of one of his professors in seeking an accommodation due to this interference with his ability to function academically.[89]

104.    White's ability to receive an education at TNS was further disrupted by SD's continued malignant conduct on TNS's campus, particularly at the University Center. For weeks in January and February 2024, SD brazenly stationed himself outside the University Center's entrance at 66 W. 12th Street with a megaphone, loudly haranguing and harassing people as part of his anti-Israel protests as they entered the building. SD's anti-social conduct violated TNS's student conduct policies and made White fear for his safety and well-being each time he approached the building. SD's protests occurred where SD had previously discriminated against and assaulted White and began the harassment campaign against him; and White was concerned that if he went through the front entrance where SD protested, SD could easily identify White and once again single him out, record him, harass him, and assault him. For his safety, White avoided the front entrance altogether.

105.    White asked TNS for a campus escort under its policies, but his request was denied. White then went directly to TNS's campus security office and spoke with Officer Biondo to set up an alternate route for entry to the University Center through the dorms. Thus, for weeks White was unable to walk through the front doors of TNS's main academic building to attend classes and had to surreptitiously use a round-about path through the dorms to avoid further harassment from SD, who was allowed free rein to harass students entering and exiting the University Center as part of his anti-Israel protests, despite his history of repeatedly discriminating against students based on their protected identity. White was only able to arrange an alternate entrance to his classes by going directly to Officer Biondo because TNS's administrators would not help him.

---

[89] *Id*.

**H. TNS's investigative reports contains factual errors and breaches of confidentiality.**

106.    Two weeks later, on March 5, 2024, White emailed Hosking, Charles-Bowie, Watson, and Schmutz again, pleading with them to treat the investigation and his rights seriously, to provide evidence related to the claims against him as promised, and to address the targeted discrimination against him:

> I write to you once more, under circumstances that I find increasingly unacceptable and deeply distressing. The continued lack of communication and the delay in delivering the final evidence report, now overdue by five days, directly impacted my academic standing and personal well-being during this critical final semester. The silence for the past 12 days, despite my repeated attempts to seek updates and clarity, increases an already challenging situation. This delay and lack of engagement are detrimental to my immediate academic responsibilities and cast a long shadow over my future. The absence of crucial evidence, specifically the surveillance footage and Mike Biondo's statement, remains a significant concern, undermining the fairness and transparency of the investigation process.

> The unresolved issue of being denied access to university facilities based on a discriminatory presumption about my identity raises serious questions about our institution's commitment to inclusivity and non-discrimination. This, coupled with the institution's apparent inaction towards the harassment I've faced on social media, compounds my distress and urgency for resolution. This series of events has placed me in a situation where I cannot be my whole self, causing considerable harm mentally and impacting my ability to engage fully with my academic and social life, making it increasingly difficult to focus, study, and participate in university life and professional life.

> The delay in addressing these matters is wholly unacceptable and contradicts our institution's values. I expect prompt and decisive action to rectify this situation, ensuring fairness, transparency, and respect for all parties involved.

> What else must I do to elicit a response from your office? This situation has reached an outrageous level of disregard for a student's concerns and rights. I implore you to treat this matter with the urgency and seriousness it warrants. Your immediate attention and action are crucial not only for my situation but as a testament to the integrity and values of our institution.[90]

---

[90] Correspondence attached as Exhibit L at 1.

107.    Charles-Bowie responded on March 6, 2024, explaining that the investigation had not moved forward, she had not followed up as promised in her February 5th email, and she had not responded to his February 22nd email because she had been suffering from an illness.[91]  As with Charles-Bowie's jury duty, it was not clear why White had not been informed of the delay and why TNS had not assigned another administrator to the case, particularly in light of Charles-Bowie's repeated absences and incapability of performing basic tasks essential to the investigation. Charles-Bowie stated that the surveillance footage had been added to the investigative report and would be made available to White, but that Officer Biondo had declined to participate in the investigation and would therefore not be providing a statement.[92]  It was not clear why it was optional for Officer Biondo to give a statement on an incident involving security violations and violent conduct at the University Center when his role was to maintain safety on campus and help enforce TNS's conduct policies.

108.    White responded to Charles-Bowie, raising concerns about the absence of a statement from Officer Biondo and how that would undermine the comprehensiveness and accuracy of the investigation.[93]  White asked Charles-Bowie to explain how he could access the surveillance footage, and whether she could send him a file with the footage alongside all the other evidence collected during the investigation.[94]  White also asked Charles-Bowie for guidance on how he could make sure SD and his allies' antisemitic Title VI violations against him could be addressed.[95]

---

[91] *Id*. at 2.
[92] *Id*.
[93] *Id*. at 2-3.
[94] *Id*.
[95] *Id*. at 3.

109.    Charles-Bowie responded that the surveillance footage would be included in the investigative report and White could view it when it was shared with White and SD for a second 10-day review period of evidence.[96]  It was not clear why White and SD would not simply have access to the surveillance footage and other evidence so that they could make full use of it in preparing their arguments and exhibits for the hearing.  Furthermore, this second review period had not previously been communicated to White, indicating that Charles-Bowie had not properly informed him of the timeline and steps of the grievance process.  Charles-Bowie also stated that Officer Biondo could not be "compelled" to participate the formal grievance process, but this explanation did not address why Officer Biondo did not provide any report or written statement regarding SD and his allies' violation of security and student conduct policies in blocking access to the University Center or the assault incident between SD and White.  Concerning the potential Title VI violation, Charles-Bowie stated she would need to "confer" about it with her colleagues because her office only addresses potential Title IX violations.[97]

110.    White responded to again ask why a statement from Officer Biondo was not being included in the investigation given that SD directly named Officer Biondo in his allegations.[98] White also asked why the surveillance footage was not being released immediately so that the incident in question could be better understood.[99]

111.    Charles-Bowie answered that Officer Biondo declined to participate in the grievance process, though she did not explain why there was no report or other statement by him that had been prepared in response to the events initially.[100]  Regarding surveillance footage,

---

[96] *Id.*
[97] *Id.*
[98] *Id.* at 4.
[99] *Id.*
[100] *Id.*

Charles-Bowie stated that she could not release the surveillance footage to White before SD and that both parties would receive all investigative materials at the same time so that the process could be "equitable."[101]  She stated that the report remained under review by all departments involved in the grievance process.[102]  Charles-Bowie provided no explanation why the surveillance footage could not simply be released to *both* White and SD immediately, nor did she provide a time estimate for when this review period would be completed or an explanation for why this process still remained ongoing four months after its start given that the incident in question was a straightforward occurrence that lasted for only a few minutes.

112.    In light of Charles-Bowie's refusal to obtain a statement from Officer Biondo or to provide meaningful access to the security camera footage of the assault incident, White decided to conduct his own research.  During March and April 2024, White contacted Officer Biondo directly and sought access to the security camera footage independently.  White was able to speak with Officer Biondo multiple times about the SJP protests and assault incident on December 4, 2023.  Officer Biondo expressed strong concerns about the events at the University Center and TNS's systemic security failures, which were exacerbated by its ongoing refusal to punish activist students and student groups for antisemitic and anti-Israel protests, regardless of the rules they violated.

113.    On March 7, 2024, White followed up with Charles-Bowie to ask for the estimated date of completion of the investigative report and the start of the second 10-day review period.[103]  White also informed Charles-Bowie that the ongoing grievance process was harming his mental

---

[101] *Id.*
[102] *Id.*
[103] *Id.* at 4-5.

health and thus was requesting access to counseling services and her assistance in obtaining extensions and adjustments for his coursework.[104]

114.    Charles-Bowie responded that the investigators were trying to complete the review as soon as possible but refused to give a timeline.[105]  She agreed to connect White with a counselor and to assist him with academic accommodations.[106]

115.    A counselor subsequently reached out to White and he scheduled an appointment for counseling on March 8, 2024, to address the psychological harm he was suffering from TNS's failure to protect his rights and conduct the investigation process properly.

116.    On March 10, 2024, White received notice that the second 10-day review period had begun, during which White was supposed to be given access to the updated investigative report and the collected evidence, including the surveillance footage.  Despite this notification, White did not receive access to either the report or the evidence.  Nor did he receive it on March 11th, the second day of the supposed 10-day review period.  White was not provided any explanation about this discrepancy.

117.    On March 11, 2024, White sent an email to Charles-Bowie asking whether he would receive the evidence that day or if there had been a change in the schedule.[107]  He also addressed his concerns about the lack of communication and consistency regarding the grievance process and its timeline and how he had received no updates on the progress of the Title VI investigation he had continuously asked for:

> Regarding the 10-day review period, today marks the end of the second day since it began on March 1st. Could you please confirm if the folder containing the final evidence will be shared today, or if there's been a change in the schedule? It seems

---

[104] *Id.*
[105] *Id.* at 5.
[106] *Id.* at 5-6.
[107] *Id.* at 6.

as if the dates have been shifting, and I'm left wondering if these changes are made ad hoc. Understandably, unforeseen circumstances such as illness and jury duty can occur, but given the gravity of the accusations at hand, the extension of the process feels disproportionate. Is there not an alternative staff  ember who could ensure the continuity and timeliness of this case, providing concrete dates and adhering to them?

Additionally, I'm concerned about the progress of the Title VI investigation. Could you provide an update on where things stand with that? The overall elongation of this process has been considerably taxing. Thank you for your ongoing support and understanding. Hoping for a clear timeline and more definitive answers.[108]

118.    Charles-Bowie did not respond to White's message.

119.    The stress, doubt, and torment of the interminable and inconsistent investigation process and TNS's ongoing refusal to address White's Title VI claims and the harassment campaign against him continued to interfere with his coursework.  Despite White's request that the TNS administration inform his professors about the disruptions to his coursework and his need for accommodation—which Charles-Bowie had claimed she would do—this was apparently not done.  On March 11, 2024, one of White's professors, Limassol Zok, reached out to White to ask about the status of his Capstone 2 project and to state it was necessary for him to submit his midterm submission "in due time."[109]  Per White's discussion with Charles-Bowie, Zok should have been informed about White's need for extra time to complete the assignment, but White was forced to explain the circumstances and stress of the ongoing investigation process to Zok directly:

Hello Professor I thought the school reached out to you upon my request and my rights with what [I] am going through. The school is creating one of the worst semesters for me due to their lack of communication and deter with the false assumption that I was accused of. There was an incident where a pro palestine protestor wouldn't allow me into class and blocked off the door because he thought [I] was Jewish last semester. He then [accused] me of assault but the school has the video evidence and knows that didn't happen. I don't understand why they are dragging it out like this. I'm sorry I haven't submitted my midterm I was going to submit it before next monday. I am really going through a lot right now and [I]

---

[108] *Id.*
[109] Correspondence attached as Exhibit M.

don't know why the school is putting me through this. Thank you for your time and checking in.[110]

Zok was fortunately willing to allow White the extra time he requested.[111]

120.    Charles-Bowie's next communication to White was over a week later on, March 18, 2024—the ninth day of the supposed 10-day review period—when she shared a Google Docs file with him titled "INVESTIGATIVE REPORT: [SD] – White."  Accompanying the file was a message from Charles-Bowie:

> Good afternoon,
>
> Here is the final investigative report. We were able to get a statement from Officer Biondo and the surveillance footage from campus safety has been added also. After careful review and conferring with Student Conduct & Community Standards, it has been determined that this case will be adjudicated administratively in lieu of a hearing, which serves to expedite the process considerably. The 10 day review period has been reduced to 72 hours. Student Conduct & Community Standards will be reaching out to you with next steps.
>
> Also, your formal complaint against [SD] is underway and the report for your complaint is in progress. Please let us know if there is any further evidence or witnesses that you would like us to reach out to. Thank you.[112]

None of the changes announced in this message—switching to a 72-hour review period from 10 days and from a hearing to an administrative adjudication—were made in consultation with White. This was the first White learned of these changes and there was no explanation provided for why they were being made without previous mention, over four months into the grievance process. This message was also the first time that TNS confirmed that it was initiating a formal complaint against SD; there was no explanation for why this had not been done four months earlier when White first came to TNS about SD's Title VI violations.

---

[110] *Id.* at 1.
[111] *Id.* at 2.
[112] Correspondence attached as Exhibit N at 1.

121.    The updated investigative report contained statements provided by SD as Complainant, White as Respondent, and Officer Biondo and VS as witnesses. The statements provided by SD and VS were substantively similar to what Charles-Bowie had sent White regarding SD and VS's claims against him on December 7, 2023. These claims were directly contradicted by the security camera footage that was accessible alongside the report. Officer Biondo's statement confirmed what the security camera footage showed: that White did not punch or attempt to punch SD or VS.

122.    At the bottom of the report, there was a note: "None of the surveillance footage shows any interactions between [SD] and James Beauchemin. The issue is whether it is more likely than not that Brandon committed the acts that [SD] has alleged against him."[113] This note was peculiar because it referred to an individual that had nothing to do with any of the complaints at issue. The note indicated severe issues with the integrity of the investigation process because it wrongfully stated the only issue as being whether White was guilty of SD's accusations, making no reference to White's claims against SD and SJP. This note again confirmed that TNS prioritized SD's patently false accusations over White's complaints and showed that TNS's investigation was getting basic facts wrong in service of avoiding accountability for SD's discriminatory conduct against White.

123.    On March 20, 2024, after White had reviewed the investigative report, he sent Charles-Bowie an email to ask why the report referred to "James Beauchemin."[114]

---

[113] *Id.* at 8.
[114] *Id.* at 9.

124.    Charles-Bowie responded on March 21, 2024, that Beauchemin was another student from a different case involving SD and that he had nothing to do with White's case, apologizing for the confusion.[115]

125.    White was shocked by Charles-Bowie's unhesitating breach of investigative confidentiality concerning another student's case and the complete lack of professionalism evidenced in both the initial error of including it in the investigative report—which should never have happened in a properly reviewed document that took over four months to prepare—and Charles-Bowie's casual, dismissive manner of addressing it.

126.    In response to this stunning breach of confidentiality and professionalism, White sent an email to Charles-Bowie, Schmutz, Hosking, and Watson, informing them of the systemic problems with the investigative process:

> I am writing to you, filled with frustration and dismay, regarding the continuous delays and the breach of confidentiality in my case. The disclosure of an unrelated student's name is not just alarming but utterly unacceptable, reflecting a grave lapse in the handling of sensitive information.
>
> The silence since the March 18th notification about the administrative adjudication process is deeply troubling. The promised 72-hour follow-up period has elapsed without any communication, exacerbating my concerns and diminishing my trust in the process's integrity and your office's ability to manage this matter effectively.
>
> The lack of professionalism displayed through these delays and the breach of confidentiality necessitates immediate rectification. I demand a comprehensive update by tomorrow, Tuesday, April 2nd, providing a clear status of the investigation. I also request an explanation for the delay in communication and clarification on why the case is being adjudicated.
>
> The video evidence clearly shows what happened, underscoring the urgency of this matter. I am frustrated with the lack of communication and the extended timeline of this investigation. It is imperative that these issues are promptly addressed and resolved to restore trust in the process.

---

[115] *Id.*

I expect your urgent response in addressing these critical concerns.[116]

127.    White's concerns and frustrations expressed in that message, including the breach of confidentiality, were never addressed.

### I.    TNS refers the grievance process to the Office of Student Conduct & Community Standards.

128.    On April 2, 2024, Charles-Bowie informed White that SD's complaint was moving forward to the adjudication process now that the investigation had closed.[117]  She also informed White that the investigators were trying to contact SD regarding White's formal complaint against him, and that the investigative report for White's complaint was almost complete.[118]

129.    On April 4, 2024, White received an email from TNS's Director of Student Conduct, Kamla Holland.[119]  Holland introduced herself and apologized for the "delay in this process," stating that the Title IX office had referred White's case against SD to Student Conduct & Community Standards for adjudication.  Holland sought to schedule an initial meeting with White regarding his Title VI concerns.

130.    Holland's introductory email, and Charles-Bowie's statement that investigators were still attempting to get in contact with SD concerning White's complaint, reflected that TNS had only recently begun to investigate White's Title VI complaints about SD's antisemitic assault against White and interference with his education at the protest and SD's continuing harassment against him, despite White reporting the assault incident to TNS five months before on December 4, 2023.  There was no apparent reason why TNS immediately pursued SD's allegations against White—which were readily disproven by the surveillance footage—while refusing to investigate

---

[116] Correspondence attached as Exhibit O at 1.
[117] *Id*. at 1.
[118] *Id*.
[119] *Id*. at 2.

White's for almost half-a-year despite White's repeated complaints to TNS about SD's ongoing retaliatory harassment and his repeated requests for TNS's intervention.

131.    White responded to Holland's introduction and agreed to an initial meeting scheduled for April 9, 2024.[120]  Further communication between White and Holland indicated that White's complaint against SD was now solely with the Office of Student Conduct & Community Standards.[121]

132.    On April 9, 2024, White and an advisor met with Holland and her colleague Brianna Demorcy.  During the meeting, White discussed his understanding of the assault incident with Holland and Demorcy and they provided him an overview of the grievance process and its timeline. During the meeting, Holland made a remark about White grabbing SD's scarf—the large keffiyeh that SD was wearing during the December 4th protest.  This remark was shocking and disturbing to White because it showed that Holland did not understand basic facts about the assault incident and appeared to have made up false details about the attack on White that were prejudicial to him. Not only did White not grab SD's keffiyeh—as demonstrated by the security camera footage that Holland should have been familiar with—but that claim was never made in either SD's or VS's charges against White or in their statements to The New School Free Press.  By all appearances, Holland made it up on her own.  This incident greatly undermined White's confidence in the integrity of grievance process and in Holland's impartiality and competence to provide him fair procedure and a fair result in the process.

133.    White attempted to memorialize his understanding of what Holland and Demorcy had explained about the process and its timeline by email on April 10, 2024, asking Holland to

---

[120] *Id.*
[121] *Id.* at 3-6.

confirm the steps that would be taken and when, and requesting answers to additional questions and concerns.[122]  Specifically, White asked Holland:

- To confirm that a pre-hearing meeting would occur on April 18, 2024;

- To confirm that the pre-hearing was for discussing the process for the full hearing and to provide a detailed explanation of SD's charges against White and of White's charges against SD, as well as the composition of the adjudicatory panel and how it would be selected;

- To confirm that he would not need to prepare or submit any statements either prior to pre-hearing meeting or at it;

- To confirm that his Title VI claims were going to be adjudicated in a separate proceeding against SJP;

- To clarify whether SD would also face personal disciplinary charges for blocking White's entrance into the University Center and for discriminating against him with antisemitic slurs in violation of TNS's Student Code of Conduct—White emphasized that he wanted to make sure his allegations about SD's personal involvement in the incident were taken seriously and investigated separate and apart from any discipline for SJP;

- To clarify whether the grievance process would be resolved by a hearing in light of Charles-Bowie's March 18, 2024, message that the matter was now being adjudicated without a hearing.[123]

134.    Holland responded on April 10, 2024, claiming she had already answered his questions but that she would nonetheless put her answers in writing and get back to him "as soon as possible."[124]  Contrary to Holland's response, she had not answered all of his questions; contrary to her promise to get back to White as soon as possible, Holland never followed up with White.

135.    On April 10, 2024, White also met with Dean Hosking and Professor Raz Godelnik about his ongoing frustration with TNS's handling of the grievance process: the shifting timelines, the contradictory statements about procedure, White's difficulty in getting clear answers, the

---

[122] *Id*. at 6-7.
[123] *See id*.
[124] *Id*. at 8.

administrators' lack of professionalism, and their refusal to address his Title VI complaints—

concerns which White explained in an email to Hosking in advance of their meeting:

> Thank you for your support. I need to inform you that my case is now reverting to a hearing before a panel. I am at a loss, as I was previously informed on March 18th that the case would be resolved through an administrative decision. Now, it appears I must present my case to a panel of 3-5 people. Just when I felt I was regaining control and catching up with my academic work, this shift has thrown me off balance again.
>
> The constant changes and lack of clear communication over the past 5 months have been incredibly challenging, and I wouldn't wish this experience on anyone. Moreover, during a discussion before my prehearing, Kamla made an offhand remark, claiming she saw me attempting to take the accuser's scarf in the video—a detail never previously mentioned or alleged. This comment deeply concerns me as it seems to reveal a bias, and I worry it might influence the outcome of the case.[125]

136.    After their meeting, White asked Hosking for assistance with getting his

outstanding questions to Holland addressed.[126]

137.    On April 12, 2024, White followed up with Hosking to share his list of questions

that remained unanswered, noting that Holland had said on April 10th that she would answer his

questions "as soon as possible" but had never followed up, and that the pre-hearing was now less

than a week away.[127]  The list of unconfirmed and unresolved questions was as follows:

**Pre-Hearing Meeting Confirmation**
Is it correct that there is a pre-hearing meeting scheduled for April 18, 2024, at 3:15 pm?
Will this meeting discuss the specific charges against me and [SD], as well as the composition and selection of the adjudicating panel?

**Preparation for Pre-Hearing Meeting**
Do I need to prepare or submit any statements or documents for the pre-hearing meeting on April 18th?
If so, what specific documents or statements are required?

**Attendance at Pre-Hearing Meeting**

---

[125] Correspondence attached as Exhibit P at 1-2.
[126] *Id*. at 3.
[127] *Id*. at 5.

Apart from my advisor and myself, who else will be attending the pre-hearing meeting?

**Claims Against [SD]**
Will the claims I made against [SD] for violating university rules on December 4, 2023, be adjudicated in this proceeding or in a separate one?

Will [SD] face individual disciplinary charges for his actions and comments during the incident, separate from the organizational proceedings against SJP?

**Representation at Hearing**
What kind of representation am I entitled to during the hearing?
Am I allowed to have a lawyer represent me, or only an advisor who cannot participate?

**Campus Policies and Procedures**
Can you provide the campus policies or manuals that address this process and my rights?
Can you refer me to the specific sections relevant to this situation?

**Process Clarification**
I was informed on March 18, 2024 by via a message shared by Cassita Charles-Bowie through Google Docs that, "After careful review and conferring with Student Conduct & Community Standards, it has been determined that this case will be adjudicated administratively in lieu of a hearing, which serves to expedite the process considerably. The 10 day review period has been reduced to 72 hours. Student Conduct & Community Standards will be reaching out to you with next steps." The message was signed "Student Equity, Accessibility & Title IX." The final Investigative Report dated December 8, 2023, which was also sent to me on March 18, 2024 in that communication from Cassita Charles-Bowie, similarly concluded: "After a thorough review of the evidence and report, it has been determined that this case will be adjudicated administratively in lieu of a hearing."

Can you explain the change to a hearing process?
Can you provide documentation or communications that detail this change in the process?

**Bias and Assumptions in Video Analysis**
Can you explain why there was an assumption made about me grabbing Mr. [SD's] scarf, especially when this action is not clearly depicted in the video?
Given that the action of grabbing [SD's] scarf was never mentioned in any previous complaints, why was this raised as an issue now?
As an unbiased party, how do you justify this interpretation of the video evidence?[128]

---

[128] *Id.* at 7-9.

138.    Later on April 12th, White received an updated investigative report from Charles-Bowie, with an attached message stating that White would have 72 hours to review the report and attachments in advance of the pre-hearing meeting.[129]   The updated report indicated a further breakdown in the integrity of TNS's handling of the grievance process because it now stated that no interaction had occurred between SD and White during the assault incident—in direct contravention of the testimony from both SD and White and the security camera footage.[130]   There was no clear explanation for how this error could have been made five months into the grievance process, a week before the pre-hearing meeting.

139.    That evening, White followed up with Hosking and Godelnik to let them know he had received the updated investigative report and the inexplicable and shocking error it contained.[131]

140.    By April 15, 2024, with the pre-hearing meeting only three days away, White had still not received a follow up from Holland about his questions.   White sent Charles-Bowie, Hosking, Godelnik, Watson, and the Office of Student Conduct and Community Standards an email expressing his grave frustrations and concerns with the integrity of the grievance process:

> I am writing to express serious concerns about the handling of the investigative report related to the December 4, 2023, incident involving myself and [SD]. The same report, initially provided on March 18th, has been resubmitted with a reiterated 72-hour review deadline, which is both unreasonable and insufficient for a thorough analysis given the complexity and severity of the allegations.
>
> It is imperative to question the organization and professionalism of this process, as critical evidence in the report, such as the surveillance footage, clearly supports my narrative by showing [SD] obstructing my access to the university. This is a significant oversight that has not been adequately addressed.

---

[129] Correspondence attached at Exhibit Q.
[130] *Id*. at 8.
[131] Exhibit P at 5-6.

Given the grave implications of these proceedings on my academic and personal standing, I urgently request an extension for the review period to ensure a comprehensive evaluation and response. Additionally, I seek clarification on who is overseeing this case to discuss these procedural inconsistencies and ensure that further steps are handled with the diligence and fairness required.

This situation requires immediate attention and rectification. I expect a prompt response detailing how these issues will be resolved and who will be responsible for overseeing the remainder of this process.[132]

141.    On April 16, 2024, Hosking replied to all the recipients of White's April 15th email, encouraging that "Brandon's request be supported" because "this is his final semester, and the incident and long investigation has impacted his academics."[133]

142.    White subsequently received conflicting messages from Charles-Bowie and Holland.    At 9:12 AM, White received a message from Charles-Bowie stating that the review period for the investigative report had "been extended to 5/10/24 to allow time to reference the report through the adjudicatory phase of the process as well as in the event that any appeals are filed."[134]    Then at 9:16 AM, White received a contradictory message from Holland stating that "this case is now in The Office of Student Conduct" and that "the 72-hour review is related to this office."[135]    While Holland offered to consider an extension if White needed one, she directly contradicted the extension provided by Charles-Bowie, stating "I am not able to give you 12 days to review any new information that is related to this case, the Office of Student Conduct has to move forward with this process."[136]    Holland's message also contradicted her previous representations to White: she now stated that the conduct review panel would also be reviewing White's Title VI claims against SD *alongside* SD's claims against White—a dramatic change from

---

[132] Correspondence attached as Exhibit R at 1.
[133] *Id*. at 2.
[134] *Id*.
[135] *Id*. at 4.
[136] *Id*.

what Holland had initially told White about how his claims would be adjudicated separately from SD's claims against him.[137]

143.    On April 17, 2024, attorneys who had been assisting White as advisors throughout the grievance process sent a letter to Charles-Bowie, Holland, and Alex Perez, TNS's general counsel, raising procedural concerns about the grievance process and requesting that the April 18th pre-hearing meeting be postponed until the issues were resolved.[138]    The attached letter 1) requested "urgent clarification on the status of a 'pre-meeting' originally scheduled for April 18;" 2) requested a meeting with Charles-Bowie, Holland, and Perez so that White's attorneys could discuss their "concerns that [TNS] is not following its own internal processes with respect to investigating the multiple claims regarding an incident where White was physically attacked by another student on December 4, 2023," and 3) instructed TNS "to preserve any and all documents related to this matter, in the event that White is required to vindicate his rights in court."[139]

144.    The letter described the factual background of the grievance process: SD and VS's assaults and slurs against White on December 4, 2023, and their ensuing retaliatory harassment campaign against him.[140]    The letter asked TNS to confirm that it had not allowed its school resources to be used to further SD and VS's defamation and harassment against White:

> This widespread doxxing campaign has damaged White's reputation and sense of physical safety and well-being on campus. As you are no doubt aware, publishing false statements that are widely communicated to third parties constitutes defamation under New York law. We would like The New School and Parsons to confirm in writing that no university resources (including, but not limited to, school wifi, school-sponsored Instagram, Slack, email platforms, or other forms of university-sponsored media) are being used to enable this doxxing / bullying and

---

[137] *Id.*.
[138] Correspondence attached as Exhibit S at 1.
[139] *Id.* at 2.
[140] *Id.* at 2-3.

defamation campaign against White and that these actions are being investigated for possible violations of the student code of conduct.[141]

145.    Based on Charles-Bowie's email from April 16, 2024, stating that TNS had granted White an extension until May 10, 2024, to review the investigative report, the letter asked TNS to confirm that the pre-hearing meeting originally scheduled for April 18th had been rescheduled for a date after May 10—after the close of the extended review period.[142]    Due to the procedural irregularities in the grievance process, the letter requested "full and complete copies of all [TNS's] files related to White, any grievances issued against him, as well as the files related to his grievance claim against students who physically assaulted him on or about December 4, 2023."[143]    The letter stated that White's attorneys were "concerned that White's due process rights [were] not being respected because of his perceived Zionist identity" and that they "would like to understand why this process unspooled in the way it did" in a discussion with Charles-Bowie, Holland, and Perez "prior to this matter proceeding any further."[144]

146.    The letter identified the "procedural irregularities" White's attorneys had identified and requested TNS resolve before continuing the process:

> As you know, White categorically denies the accusations of physically assaulting a member of Students for Justice in Palestine (SJP) and using anti-LGBT slurs. Indeed, the five-minute video of White's encounter with [SD] and [VS] demonstrates that White is the victim of a physical attack based on his perceived Jewish or Zionist identity.
>
> We are troubled by the inconsistencies and apparent procedural irregularities in the handling of this matter by The New School. Initially, the Title IX Office issued a "final investigative report" on March 18th, indicating that the matter would be administratively adjudicated in lieu of a hearing, only to later reverse this decision and require Brandon to undergo a full hearing. These sudden, inexplicable, changes

---

[141] *Id.* at 3.
[142] *Id.*
[143] *Id.*
[144] *Id.* at 3-4.

raise concerns about due process, fairness, and adherence to established university procedures.

Furthermore, the communication regarding the change in procedure lacked clarity and transparency, leaving Brandon and his legal representation with unanswered questions and inadequate time for preparation. The post hoc alteration to the conclusion of the investigative report, without sufficient explanation, compounds these concerns.

Brandon has sought clarification and additional documentation regarding these developments, as evidenced by his email correspondence with the relevant university offices. Regrettably, satisfactory responses have not been forthcoming, further exacerbating the uncertainty surrounding this matter.[145]

147.    The letter concluded with a request that TNS ensure White was afforded due process consistent with TNS's policies and applicable legal standards, including "providing clear and timely communication, as well as access to all relevant evidence and procedural documentation:"

Considering the numerous questions we have about the fairness and impartiality of this process to date, we urge The New School to ensure that Brandon is afforded his rights to a fair and impartial process, consistent with established university policies and applicable legal standards. This includes providing clear and timely communication, as well as access to all relevant evidence and procedural documentation.
Additionally, we request confirmation of the extension of the review window for the latest investigative report, consistent with what Brandon was told by the Title IX Office, to allow Brandon adequate time to fully assess its contents and prepare a comprehensive response.

Furthermore, we expect prompt and comprehensive responses to Brandon's inquiries regarding the upcoming pre-hearing meeting and the overall hearing process. We trust that The New School will demonstrate its commitment to fairness, equity, and due process in addressing White's concerns. We remain hopeful that a satisfactory resolution can be reached.

We look forward to your prompt attention to these concerns and a constructive resolution of this matter.[146]

---

[145] *Id*. at 4.
[146] *Id*. at 4-5.

148.    Charles-Bowie, Holland, and Perez did not respond to or address the letter in any way.

149.    On the morning of April 18, 2024, White sent Holland an email asking her to confirm that the pre-hearing meeting had been postponed in light of the letter from his attorneys the previous day.[147]

150.    Holland responded that the meeting had not been postponed, refusing to address any of the other requests in the letter.[148]  Regarding White's questions about the pre-hearing meeting that he asked Holland on April 10th—which she still had not answered despite repeatedly saying she would do so "as soon as possible"—Holland stated, "Your questions are received, being reviewed and you will hear form my office as soon as possible in an email."[149]  Holland conspicuously failed to address that White's questions were *about* the pre-hearing meeting happening that day and that Holland's failure to answer them left White confused and unsure about what was required of him in the pre-hearing meeting, what role his advisor could play, and what was being done to investigate his claims against SD.  Holland also stated that the Zoom link for the pre-hearing meeting was contained in a calendar invite that White had been sent and to reach out to her if he had any difficulties with the link.[150]

151.    White responded to ask Holland to resend the link so that his advisor could attend the meeting.[151]  White again stated his confusion about the purpose of the meeting because of the contradictory and ambiguous statements he had received from Charles-Bowie and Holland and

---

[147] Correspondence attached as Exhibit T at 1.
[148] *Id*. at 1.
[149] *Id*.
[150] *Id*.
[151] *Id*. at 2.

because of Holland's ongoing refusal to answer his questions.[152]  White stated that he had been told that the review period had been extended into May by Charles-Bowie; he also stated that he had asked Holland for an extension and that she had not provided a clear answer about how long she would provide an extension for.[153]  White also addressed that, to his knowledge, the review period for the final investigative report was still open and that his list of questions he had sent her on April 10th still remained unanswered despite Holland telling him twice that she would answer them "as soon as possible."

152.    Holland again refused to directly answer White's questions, claiming (bizarrely) that she believed all of his questions had previously been answered and that she had "no problem restating or answering new questions."[154]  Holland requested White resend the email that White said he had not received a response to.[155]  Holland stated that she would "continue to respond to [White's] emails including yesterday's email sent on [his] behalf and provide answers about [TNS's] process and next steps."[156]  Holland's assurance, like her others, was false: she never addressed White's questions and never responded to the email sent by White's attorneys.

153.    The meeting was scheduled for 3:15pm on April 18, 2024.  In a further demonstration in the lack of professionalism and failure to get basic procedures right that characterized TNS's handling of the grievance process, the Zoom link that Holland had sent White was incorrect and inoperable: it was a link for the previous meeting that had been scheduled for

---

[152] *Id.*
[153] *Id.*
[154] *Id.*
[155] *Id.*
[156] *Id..*

April 9, 2024.[157]  Holland sent a corrected link at 3:19pm—four minutes after the meeting commenced.[158]  In sending the updated link, Holland failed to include White's advisor.[159]

154.    Once the meeting was finally underway and White and his advisor were able to join belatedly, the charges against him based on SD's accusations and the adjudication process were explained.  The meeting did not address the concerns identified by White's attorneys in the April 17th letter, nor their requests for a meeting to discuss the procedural irregularities or for the process to be postponed until White's due process rights could be ensured.  The meeting also did not address White's request for clarification about his claims against SD and SJP.

### J.   TNS refuses White's request for protection after SD and SJP take over TNS's campus with an unlawful "encampment."

155.    As previously described, on April 20, 2024, SD led SJP in taking over the University Center with an unlawful and dangerous "encampment" in an attempt to coerce TNS into discriminating against Israelis.  Because SD was leading SJP in occupying the building with the encampment, and because SJP and its parent organization, National Students for Justice in Palestine—which has strong connections to Hamas and is responsible for directing, supporting, encouraging, and mobilizing violent, antisemitic protests on campuses across the country—issued calls for pro-Hamas protestors to "flood" TNS in defense of the encampment, White was afraid for his safety in going to the University Center.  White was also unsure of how the No-Contact order applied to a situation where SD was unlawfully occupying the central building on campus in violation of school policies with the declared intent of disrupting school function and not leaving until his group's discriminatory demands were met.

---

[157] *See id*. at 3.
[158] *Id*.
[159] *Id*.

156.    On April 22, 2024, White sent an email to Charles-Bowie, Holland, and Hosking, requesting that TNS provide the security and campus escort services that Charles-Bowie had promised were available to White in her emails to him on December 7, 2023:

> I am reaching out to formally request additional supportive measures, as outlined by the university's policies regarding student safety. These measures are particularly pertinent due to ongoing concerns for my personal safety on campus, connected to the presence of an illegal encampment in the UC main entrance, where [SD] has been observed.
>
> As a student, I am entitled to these supportive measures, which the university has offered to ensure the wellbeing and security of its community members. The specific measure s I am seeking to utilize are:
>
>> 1. **Campus Escort Services**: I am requesting campus escort services during my commutes to and from class, This service is essential for ensuring my safety.
>>
>> 2. **Increased Security and Monitoring**: Additionally, I am requesting increased security and monitoring around the UC main entrance and surrounding areas.
>
> Given the current circumstances, it is critical that the university upholds its commitment to student safety by implementing these measures promptly.[160]

157.    Charles-Bowie responded on April 23, 2024, stating that she would request increased security and monitoring around the main entrance to the University Center but that Campus Safety was "not able to provide campus escort services."[161]   Charles-Bowie stated that White could provide his schedule so that "campus safety guards could] be alerted to be vigilant of [his] comings and goings" if he feared someone on campus.[162]

---

[160] Correspondence attached as Exhibit U at 1.
[161] *Id*. at 1.
[162] *Id*.

158.    White responded that he was "disheartened and puzzled" that the escort services were unavailable despite being offered previously and asked how the No-Contact order interacted with SD's rules-violating occupation of the University Center:

> I am disheartened and puzzled to learn that campus escort services, previously listed as an available supportive measure, cannot be provided. This raises a significant concern: why was this service offered as an option if it is not actually available? This discrepancy is especially troubling given my current safety needs on campus.
>
> Additionally, I want to remind and ensure that the no-contact order between [SD] and myself is still fully enforced. This order stipulates that neither of us may have contact with the other in any form, whether directly or indirectly, and we must make concerted efforts to avoid close proximity in both physical and virtual spaces. Given the current situation and the presence of the encampment, it is critical that this order is upheld to maintain safety and compliance with university policies.[163]

159.    Charles-Bowie did not meaningfully respond to White's message, merely stating that "Campus Safety lacks the capacity to provide that particular service" and that "the No Contact Order between [White] and [SD] is still in effect" and to "let us and/or Student Conduct & Community Standards know if [SD] violate[s] the No Contact Order."[164]

160.    Charles-Bowie's failure to address White's concerns left him fearful of entering the University Center, worried that to do so would subject him to being targeted by SD, VS, and a mob of protestors.  White was afraid that he would be subject to harassment, intimidation, slurs, and violence as a result of TNS's refusal to enforce its own policies or provide White personal protection as promised.  It seemed that TNS was requiring White to expose himself to danger and suffer harm before it would consider taking any meaningful action to protect him; and even then, there was no reason to believe TNS would take any action to help or protect White based on its failure to do so after the previous assault incident and harassment campaign by SD and his allies.

---

[163] *Id*. at 2.
[164] *Id*.

### K. TNS ends the grievance process without any action to address the hostile environment against White.

161.    On May 1, 2024, White received a decision letter from Holland adjudicating his and SD's claims against one another.[165]  Holland's decision letter ended the matter without further resolution and without imposing any disciplinary sanctions:

> This letter is to inform you that due to the incident that occurred on December 4, 2023, we believe that an educational conversation addresses the incidents that took place. It has been determined that the student conduct process regarding this matter will end with this restorative and educational outcome. Which we satisfied with our conversations and this letter.[166]

Holland refused to address any of White's Title VI claims, making no mention of SD and SJP's discriminatory conduct at the December 4th protest, the patent falsity of SD's claims against White, or SD and VS's retaliatory harassment campaign against White in violation of the No-Contact order and TNS's retaliation policy.  Instead, Holland's letter castigated White personally, ascribing no blame to SD and condemning White solely for the assault incident in which SD attacked and slurred him while denying him access to the University Center:

> During our meeting on April 9th and April 18, 2024, Ms. Kamla Holland discussed your original complaint, and concerns with your behavior. In the future, I recommend that you address conflict differently and seek out assistance from campus security if necessary. When you have conflict with another individual you should always keep a safe distance and have respectful dialogue.

> These types of incidents can escalate to situations that can cause harm to others and yourself. If you violate the student code of conduct in the future, you will be put through the appropriate process by the Office of Student Conduct and Community Standards.[167]

---

[165] Decision Letter attached as Exhibit V.
[166] *Id.*
[167] *Id.*

Holland ended the letter with an affirmation that TNS believes in the rule of law and respect for rules; an affirmation made hollow by the inconsistency of TNS's grievance process and its refusal to punish SD and SJP for their blatantly violative conduct:

> As an institution of higher learning, The New School affirms certain basic principles and values, including respect for law and adherence to fair rules and regulations. We expect members of our community to uphold and abide by the basic principles and standards of behavior that underlie our educational purpose. It is my sincere hope that you utilize this experience as a learning opportunity and take advantage of the educational opportunities being offered to you.[168]

162.    Since Holland's decision letter on May 1, 2024, TNS has not taken any action against either SD or SJP for the Title VI violations against White at the December 4, 2023, protest, or against SD for his retaliatory harassment campaign against White.  Nor has TNS closed its investigation into White based on VS's false accusations concerning the December 4th protest.  As of April 2025, the investigation remained open despite both the security camera footage of the incident disproving VS's claims and TNS finding that White did not engage in wrongdoing as alleged by SD.

163.

**L.  TNS's refusal to punish the wrongdoing against White interfered with White's ability to complete his final coursework.**

164.    TNS's decision letter was devastating to White: he had suffered six months of a torturously convoluted and inconsistent process, during which TNS abandoned White to continuing abuse, retaliation, hostility, personal attacks, and social ostracization without any assistance, for nothing.  Despite video evidence, despite SD and VS's blatant violations and retaliatory conduct, despite their clear breach of TNS's rules, TNS did nothing.  It was making the matter disappear while blaming White for his own assault and persecution.  The decision further

---

[168] *Id.*

made White fear for his safety on campus, as TNS made it clear that it would take no action to protect him from being assaulted, abused, and targeted for systematic retaliation and humiliation by SD and his allies.

165.    The decision letter came just as White was completing his coursework for his last semester and it severely impaired his ability to do so.  After receiving the decision letter on May 1st, White reached out to one of his professors, Sam Kilb, to state that he felt unsafe being on campus and to ask whether he could complete an in-person presentation scheduled for that day by video recording instead, which Kilb agreed to allow.[169]  The disruption from the decision interfered with White's ability to complete and submit his final assignment for Kilb a week later, causing him to submit it late.[170]

166.    The disruption also interfered with White's completion of his capstone project for his class with Hosking, forcing White to obtain an accommodation to have his grade for Hosking's class be an "incomplete" while he took extra time to complete the project.[171]

167.    As a result of TNS's failure to address the discrimination against White by SD, VS, their friends and allies, and the other protestors, White was subjected to a hostile educational environment that caused him mental and emotional distress, interfered with his education, and disrupted his business and personal relationships.  TNS exacerbated these harms through its incompetent, inconsistent, and interminable grievance process, culminating in its decision to dismiss White's complaint without any action to protect him from the discrimination against him or punish his harassers.

*      *      *

---

[169] Correspondence attached as Exhibit W at 1.
[170] *Id.* at 1-2.
[171] Correspondence attached as Exhibit X at 1-2.

## COUNT I
### Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*
### Hostile Environment

168.    Plaintiff repeats and incorporates by reference the foregoing allegations as if fully set forth herein.

169.    Title VI of the Civil Rights Act of 1964 (Title VI) prohibits discrimination on the basis of race, color, or national origin.  National origin discrimination includes discrimination against those who identify as or are perceived to be Jewish as well as those who identify as or are perceived to have Israel as their homeland.

170.    The U.S. Department of Education Office of Civil Rights ("OCR") has confirmed that "Title VI protects all students, including students who are or are perceived to be Jewish, from discrimination based on race, color, or national origin." Consistent with this interpretation, the OCR has demanded that federally funded schools "take immediate and appropriate action to respond to harassment that creates a hostile environment."

171.    "The U.S. National Strategy to Counter Antisemitism" that President Biden issued in March 2023 likewise directed the OCR to remind schools of "their legal obligation under Title VI of the Civil Rights Act of 1964 to address complaints of discrimination, including harassment based on race, color, or national origin, including shared ancestry, such as Jewish ancestry, and ethnic characteristics."[172]

172.    The current IHRA definition of antisemitism, adopted by the U.S. Department of Education, includes examples of anti-Zionism as widely-recognized forms of antisemitism.

---

[172] *The U.S. National Strategy to Counter Antisemitism*, The White House (May 2023), https://www.whitehouse.gov/wp-content/uploads/2023/05/U.S.-National-Strategy-to-Counter-Antisemitism.pdf (emphasis added).

173.    The New School receives federal financial assistance and is subject to the requirements of Title VI.

174.    Plaintiff White suffered a hostile educational environment at TNS in violation of Title VI due to severe and pervasive harassment and discrimination he suffered based on the perception that he is Jewish and/or Israeli.

175.    TNS discriminated against White by failing to address the antisemitic and anti-Israeli harassment and retaliation perpetrated against him by SD, VS, their friends and allies, and the other protestors based on their perception White is Jewish and/or Israeli, thereby depriving White of the full benefits of his educational opportunities at TNS.

176.    TNS's deliberate indifference enabled a hostile environment against White in violation of Title VI.

177.    TNS exercised substantial control over the harassing conduct White suffered.  The initial harassing conduct during the assault incident on December 4, 2023, occurred on TNS's campus in the University Center, and the retaliatory harassment campaign against him was prohibited under TNS policies.  TNS exercises broad disciplinary oversight over student, staff, and faculty conduct, with the ability to initiate investigations and mete out remedial and disciplinary measures against violators of its myriad policies designed to prevent the kind of behavior White was targeted with.

178.    TNS had actual notice of the severe and pervasive harassment against White.  TNS possessed enough knowledge of the violative conduct at the December 4, 2023, protest that it should have acted to prevent SD, VS, and the protestors from interfering with White's access to his classes, or swiftly remedied it after it occurred, and TNS should have initiated a formal

grievance process based on White's Title VI complaints when he first brought his concerns to TNS's attention on December 4, 2023.

179.    Additionally, TNS had actual notice of the discrimination against White based on White's statements to Rabinovitz, Eichhorn, and Charles-Bowie that he had been harassed and assaulted based on the perception that he is Jewish and/or Israeli following the December 4, 2023, protest.

180.    TNS possessed enough knowledge of SD and VS's retaliatory harassment campaign against White, in direct violation of the No-Contact order and TNS's retaliation policies, that it should have taken action to protect White.

181.    Despite TNS's actual knowledge of the discrimination against White, it allowed the discriminatory harassment against White to continue for months, with White subjected to a retaliatory campaign of defamatory and offensive lies about him organized by SD, VS, and their friends and allies. White was also forced to personally arrange an alternate entrance to the University Center for his classes due to SD's weeks-long harassing activity at the building's entrance that TNS both refused to stop, and due to its outright refusal to provide White a campus escort to protect him from this conduct.

182.    TNS knew or should have known that SD's and VS's claims against White were made in bad-faith as part of their retaliation against White to weaponize the grievance process against him and to preempt his justified Title VI complaints against them.

183.    The harassment against White was severe and pervasive, involving the use of violent physical force to prevent White from going to class, slurs targeted at him personally and publicly, defamatory false accusations spread online that White is a bigot who attacked SD, targeted harassment of White and his girlfriend's social media accounts, and direct attempts to

interfere with White's business contracts and future career, all in a self-described attempt to "ruin his life."

184.    TNS's deliberate indifference is clear from its failure to address the discrimination, harassment, and retaliation White suffered and its refusal to address clear violations of its policies:

- TNS refused to investigate White's Title VI complaints when he brought them to TNS's leadership and staff in December 2023, , while immediately beginning an investigation *against* White based on SD's and VS's malicious, easily-disproven claims about the same events—claims that TNS knew or should have known were false and made in bad-faith to harass White based on the security camera footage and SD's history of making similar frivolous complaints to TNS to harm his perceived enemies;

- TNS continued its refusal to investigate White's Title VI complaints for approximately five months, waiting until April 2024 to begin an investigation in earnest and rushing to a final "resolution" of the matter in less than a month after previously allowing lengthy delays and investigations for SD's complaint;

- TNS refused to enforce its own No-Contact order, retaliation policy, and other relevant policies for White's protection against SD and VS's retaliation campaign despite their conduct constituting clear violations and despite White's repeated requests for TNS's assistance;

- TNS refused to protect White from further harassment by SD when SD spent weeks engaged in regular protests at the entrance to the University Center, denying White's request for a campus escort and taking no action against SD;

- TNS's grievance process was incompetently and unprofessionally administrated, with inexcusable and inexplicable delays, repeated changes to standards, timelines, and

procedures made without explanation, justification, or consultation with White, breaches of confidentiality and professionalism that undermined the integrity of the grievance process, refusals to respond to White's questions, requests for clarification, and requests for assistance, and grievous errors made in the investigative analysis;

- TNS refused to provide White protection when he felt unsafe on campus after SD and SJP took over the University Center with a rules-violating encampment, despite earlier promising such protection to White;

- TNS's final investigative report in the grievance process included a demonstrably false factual finding that surveillance footage did not show any interaction between SD and White, which was directly contradicted by the footage itself. TNS used this false finding to unjustly exonerate SD for his physical assault and harassment against White and support its decision not to impose disciplinary sanctions on SD or any of the protestors who violated TNS's policies and White's rights not take to any other actions to address White's Title VI complaints, and to instead castigate White for "escalating" the assault incident while refusing to address SD, VS, and the protestors' wrongful conduct at all. Nor did TNS impose any consequence on SD for his false complaint against White.

185.    TNS' deliberate indifference contributed to the hostile environment White experienced on campus that injured him.

186.    As a result of TNS's actions and inactions, White suffered mental and emotional distress, temporal and financial loss, interference with his education, and interference with his business opportunities.  White no longer felt safe on campus, engaged therapists, and was disrupted in his coursework.

187.    TNS's deliberate indifference in violation of Title VI was the actual, direct, and proximate cause of White's injuries.

188.    White is entitled to damages under Title VI.

189.    White is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**<u>COUNT II</u>**
**Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.***
**Disparate Treatment**

190.    Plaintiff repeats and incorporates by reference paragraphs 1–167 as if fully set forth herein.

191.    Title VI of the Civil Rights Act of 1964 (Title VI) prohibits discrimination on the basis of race, color, or national origin.  National origin discrimination includes discrimination against those who identify as or are perceived to be Jewish as well as those who identify as or are perceived to have Israel as their homeland.

192.    The U.S. Department of Education Office of Civil Rights ("OCR") has confirmed that "Title VI protects all students, including students who are or are perceived to be Jewish, from discrimination based on race, color, or national origin." Consistent with this interpretation, the OCR has demanded that federally funded schools "take immediate and appropriate action to respond to harassment that creates a hostile environment."

193.    "The U.S. National Strategy to Counter Antisemitism" that President Biden issued likewise directed the OCR to remind schools of "their legal obligation under Title VI of the Civil Rights Act of 1964 to address complaints of discrimination, including harassment based on race, color, or national origin, including shared ancestry, such as Jewish ancestry, and ethnic characteristics."

194.    The current IHRA definition of antisemitism, adopted by the U.S. Department of Education, includes examples of anti-Zionism as a widely-recognized form of antisemitism.

195.    The New School receives federal financial assistance and is subject to the requirements of Title VI.

196.    TNS discriminated against White as a person perceived to be Jewish and/or Israeli in violation of Title VI through disparate treatment by treating his Title VI complaints against SD concerning the December 4, 2023, protest and the subsequent retaliation campaign differently from SD's and VS's similarly situated complaints against him.

197.    Following the December 4, 2023, protest, White brought his complaints about SD and the protestors' discriminatory conduct and interference with his access to his classes in violation of TNS policies to TNS's attention. White identified to TNS that he had been harassed and discriminated against based on the perception that he is Jewish and/or Israeli.

198.    TNS refused to open an investigation into SD or the other protestors based on White's complaints but immediately opened investigations into White based on SD's and VS's false complaints stemming from the same events.

199.    TNS further refused to enforce its No-Contact order and retaliation policies for White's protection after he brought SD and VS's retaliation campaign to TNS's attention, despite their conduct constituting clear policy violations.

200.    White repeatedly brought his complaints about the Title VI violations and the retaliation campaign to TNS throughout the grievance process for SD's complaint, but TNS continuously refused to investigate White's complaints.

201.    Even after TNS knew or should have known that White's complaints were true and that SD's and VS's were false and made in bad-faith after its review of the security camera footage

and White's evidence, it still delayed opening a formal investigation into White's complaints and still continued its investigation against White based on SD's claims.

202.    When TNS finally began its formal investigation into White's Title VI complaints against SD, approximately five months after White first made them, it rushed the investigation and treated it with less interest and seriousness than it did SD's complaint against White.

203.    TNS arbitrarily refused to provide White the protection services it maintains a policy of providing similarly situated students during grievance processes.

204.    In TNS's final resolution of White's and SD's complaints, it improperly dismissed the matter without any discipline against SD or protection for White despite the clear evidence that SD and his allies had violated TNS's policies to target and harass White based on his perceived Jewish and/or Israeli identity and that SD's complaint was false and made in bad-faith as an extension of his discriminatory harassment against White.

205.    TNS's disparate treatment of White's and SD's complaints exposed White to continued harm from SD and his allies' discriminatory harassment and retaliation against him, contributed to the hostile environment he suffered, and subjected him to a months-long, abusive grievance process that inflicted mental and emotional stress on White and severely interfered with his education.

206.    As a result of TNS's disparate treatment, White suffered mental and emotional distress, temporal and financial loss, interference with his education, and interference with his business opportunities.   Due to TNS's disparate treatment in refusing to address White's complaints, White no longer felt safe on campus, engaged therapists, and was disrupted in his coursework.

207.    TNS's disparate treatment in violation of Title VI was the actual, direct, and proximate cause of White's injuries.

208.    White is entitled to all relief available under Title VI.

209.    White is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## COUNT III
### Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.*
### Retaliation

210.    Plaintiff repeats and incorporates by reference paragraphs 1-167 as if fully set forth herein.

211.    Title VI of the Civil Rights Act of 1964 (Title VI) prohibits discrimination on the basis of race, color, or national origin.  National origin discrimination includes discrimination against those who identify as or are perceived to be Jewish as well as those who identify as or are perceived to have Israel as their homeland.

212.    The U.S. Department of Education Office of Civil Rights ("OCR") has confirmed that "Title VI protects all students, including students who are or are perceived to be Jewish, from discrimination based on race, color, or national origin." Consistent with this interpretation, the OCR has demanded that federally funded schools "take immediate and appropriate action to respond to harassment that creates a hostile environment."

213.    "The U.S. National Strategy to Counter Antisemitism" that President Biden issued likewise directed the OCR to remind schools of "their legal obligation under Title VI of the Civil Rights Act of 1964 to address complaints of discrimination, including harassment based on race, color, or national origin, including shared ancestry, such as Jewish ancestry, and ethnic characteristics."

214.    The current IHRA definition of antisemitism, adopted by the U.S. Department of Education, includes examples of anti-Zionism as a widely-recognized form of antisemitism.

215.    The New School receives federal financial assistance and is subject to the requirements of Title VI.

216.    TNS discriminated against White in violation of Title VI through retaliation against him for the protected activity of complaining to TNS about discriminatory harassment he suffered at TNS from SD, VS, and their allies at the December 4, 2023, protest and in their ensuing harassment campaign.

217.    White complained to TNS about the discriminatory harassment he suffered from SD, VS, and their allies in December 2023, and repeatedly sought TNS's intervention to investigate SD and his allies for discriminatory and harassing conduct against him based on the perception that he is Jewish and/or Israeli that violated TNS policies. White's complaints included specifically referring to TNS's obligations to prevent a discriminatory hostile environment against him based on perceptions of his identity under Title VI.

218.    TNS retaliated against White for these complaints through adverse actions that include, but are not limited to, the following:

- Arbitrarily refusing to enforce its own policies that it should have enforced to protect him against continued harassment from SD and his allies;

- Refusing to provide an adequate investigation process for White's complaints;

- Refusing to dismiss the obviously false and malicious grievances against White brought by SD and VS despite having evidence directly contradicting their claims and corroborating White's statement of the events;

- Conducting the grievance process against White in a manner that was biased against White, including through the administrator overseeing the process making up claims against White that were neither reflected in the evidence nor alleged by White's accusers—i.e., that White had grabbed SD's scarf at the December 4, 2023, protest—and through making factual findings directly contradicted by the video evidence—i.e., the claim in TNS's final investigate report that surveillance footage showed no interaction between SD and White;

- Handling the procedures and administration of the grievance process in an arbitrary, inadequate, and unjust manner, culminating in dismissing White's claims of harassment without a reasonable basis for doing so;

- Refusing to take any reasonable action to resolve White's complaints of discrimination, such as punishing SD or any of his allies for their harassment or taking any steps to protect White from future harassment.

219.    TNS's adverse actions against White were caused by his complaints to TNS about the discriminatory harassment he suffered, as demonstrated by TNS's adverse actions and its abusive investigation process against White coming in the immediate wake of White's complaints and by TNS undertaking these actions in direct response to White's complaints about the discrimination against him and about the persistent issues he was experiencing with TNS's handling of the grievance process.

220.    TNS's retaliation against White harmed White directly and exposed White to continued harm from SD and his allies' discriminatory harassment and retaliation against him, contributed to the hostile environment he suffered, and subjected him to a months-long, abusive

grievance process that inflicted mental and emotional stress on White and severely interfered with his education.

221.    As a result of TNS's retaliation, White suffered mental and emotional distress, temporal and financial loss, interference with his education, and interference with his business opportunities.  Due to TNS's retaliation in refusing to address White's complaints and enforce its policies for his benefit, White no longer felt safe on campus, engaged therapists, and was disrupted in his coursework.

222.    TNS's retaliation in violation of Title VI was the actual, direct, and proximate cause of White's injuries.

223.    White is entitled to all relief available under Title VI.

224.    White is entitled to attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

**COUNT IV**
**New York Executive Law § 296 *et seq*.**
**Hostile Educational Environment**

225.    Plaintiff repeats and incorporates by reference paragraphs 1–167 as if fully set forth herein.

226.    White is entitled to an educational environment free from harassment and discrimination.  The New York State Human Rights Law ("NYSHRL") prohibits an educational institution from permitting the harassment of any student on the basis of the student's actual or perceived religion or national origin.

227.    TNS's actions, inactions, and/or deliberate indifference to the antisemitic and anti-Israeli harassment targeted against White based on his perceived identity as Jew and/or Israeli violated the protections owed to White under the NYSHRL.

101

228.    TNS had actual notice that White had been discriminatorily harassed based on the perception that he is Jewish and/or Israeli at the December 4, 2023, protest by SD and VS based on White's statements to Rabinovitz, Eichhorn, and Charles-Bowie following the protest.

229.    Despite this actual notice of the discrimination against White, TNS failed to take meaningful and timely actions to protect White against discrimination, harassment, and retaliation directed against him on campus and during the grievance process.

230.    TNS failed to take any actions to protect White's access to classes on December 4, 2023, during the protest, and refused to protect him from physical force used against him by the protestors.

231.    TNS refused to apply its own policies and procedures to protect White from SD and VS's retaliatory harassment campaign after the December 4, 2023, protest.

232.    TNS refused to investigate White's Title VI complaints for approximately five months after he first started bringing them to TNS's attention, while immediately initiating a grievance process against White based on SD's and VS's false, bad-faith, and easily-disproven claims about the same inciting incident.

233.    TNS arbitrarily refused to provide White the protection services it maintains a policy of providing similarly situated students during grievance processes.

234.    TNS refused to impose any discipline against White's harassers or take any other actions in its final resolution of the grievance process to remedy the hostile environment White suffered.

235.    TNS's actions, inactions, and/or deliberate indifference facilitated the hostile environment against White in violation of TNS's statutory obligations under the NYSHRL.

236.    TNS's violations deprived White of the full benefits and use of TNS's educational programs and facilities.  White was denied the use of campus spaces on the basis of perceived religion and/or national origin through physical force and harassment and was subsequently targeted for discriminatory harassment in retaliation because of TNS's actions, inactions, and/or deliberate indifference.

237.    As a result of TNS's actions and inactions, White suffered mental and emotional distress, temporal and financial loss, interference with his education, and interference with his business opportunities.  Due to TNS's failure to address White's complaints, White no longer felt safe on campus, engaged therapists, and was disrupted in his coursework.

238.    TNS's actions, inactions, and/or deliberate indifference in permitting the harassments against White in violation of the NYSHRL was the actual, direct, and proximate cause of White's injuries.

239.    White is entitled to attorneys' fees and costs pursuant to N.Y. Exec. Law § 297(1).

240.    White is further entitled to all relief available under the NYSHRL.

### COUNT V
### New York Executive Law § 296 *et seq.*
### Disparate Treatment

241.    Plaintiff repeats and incorporates by reference paragraphs 1–167 as if fully set forth herein.

242.    White is entitled to an educational environment free from harassment and discrimination.  The NYSHRL prohibits an educational institution from discriminating against any student on the basis of the student's actual or perceived religion or national origin.

243.    TNS's disparate treatment of White based on his perceived identity as Jewish and/or Israeli in comparison to similarly situated students outside those protected classes violated the protections owed to White under the NYSHRL.

244.    TNS engaged in disparate treatment discrimination against Plaintiff White as a person perceived to be Jewish and/or Israeli in violation of the NYSHRL by treating his complaints against SD based on the December 4, 2023, protest and the subsequent retaliation campaign differently from SD's and VS's complaints against him based on the same protest.

245.    Following the December 4, 2023, protest, White brought his complaints about SD and the protestors' discriminatory conduct and interference with his access to his classes in violation of TNS policies to TNS's attention.

246.    TNS refused to open an investigation into SD or the other protestors based on White's complaints but immediately opened investigations into White based on SD's and VS's false complaints stemming from the same events.

247.    TNS further refused to enforce its No-Contact order and retaliation policies for White's protection after he brought SD and VS's retaliation campaign to TNS's attention, despite their conduct constituting clear policy violations.

248.    White repeatedly brought his complaints about the Title VI violations and the retaliation campaign to TNS throughout the grievance process for SD's complaint, but TNS continuously refused to investigate White's complaints.

249.    Even after TNS knew or should have known that White's complaints were true and that SD's were false and made in bad-faith after its review of the security camera footage and White's evidence, it still delayed opening a formal investigation into White's complaints and still continued its investigation against White based on SD's claims.

250. When TNS finally began its formal investigation into White's Title VI complaints against SD, approximately five months after White first made them, it rushed the investigation and treated it with less interest and seriousness than it did SD's complaint against White.

251. TNS arbitrarily refused to provide White the protection services it maintains a policy of providing similarly situated students during grievance processes.

252. In TNS's final resolution of White's and SD's complaints, it improperly dismissed the matter without any discipline against SD or protection for White despite the clear evidence that SD and his allies had violated TNS's policies to target and harass White based on his perceived Jewish and/or Israeli identity and that SD's complaint was false and made in bad-faith as an extension of his discriminatory harassment against White.

253. TNS's disparate treatment of White's and SD's complaints exposed White to continued harm from SD and his allies' retaliation against him, contributed to the hostile environment he suffered, and subjected him to a months-long, abusive grievance process that inflicted mental and emotional stress on White and severely interfered with his education.

254. As a result of TNS's disparate treatment, White suffered mental and emotional distress, temporal and financial loss, interference with his education, and interference with his business opportunities. White no longer felt safe on campus, engaged therapists, and was disrupted in his coursework.

255. TNS's disparate treatment against White in violation of the NYSHRL was the actual, direct, and proximate cause of White's injuries.

256. White is entitled to attorneys' fees and costs pursuant to N.Y. Exec. Law § 297(1).

257. White is further entitled to all relief available under the NYSHRL.

## COUNT VI
### New York Executive Law § 296 *et seq.*

**Retaliation**

258.    Plaintiff repeats and incorporates by reference paragraphs 1-167 as if fully set forth herein.

259.    White is entitled to an educational environment free from harassment and discrimination.  The NYSHRL prohibits an educational institution from discriminating against any student on the basis of the student's actual or perceived religion or national origin.

260.    TNS discriminated against White in violation of the NYSHRL through retaliation against him for the protected activity of complaining to TNS about discriminatory harassment he suffered at TNS from SD, VS, and their allies at the December 4, 2023, protest and in their ensuing harassment campaign.

261.    White complained to TNS about the discriminatory harassment he suffered from SD, VS, and their allies in December 2023, and repeatedly sought TNS's intervention to investigate SD and his allies for discriminatory and harassing conduct against him based on the perception that he is Jewish and/or Israeli that violated TNS policies. White's complaints included specifically referring to TNS's obligations to prevent a discriminatory hostile environment against him based on perceptions of his identity under Title VI.

262.    TNS retaliated against White for these complaints through adverse actions that include, but are not limited to, the following:

- Arbitrarily refusing to enforce its own policies that it should have enforced to protect him against continued harassment from SD and his allies;

- Refusing to provide an adequate investigation process for White's complaints;

- Refusing to dismiss the obviously false and malicious grievances against White brought by SD and VS despite having evidence directly contradicting their claims and corroborating White's statement of the events;

- Conducting the grievance process against White in a manner that was biased against White, including through the administrator overseeing the process making up claims against White that were neither reflected in the evidence nor alleged by White's accusers—i.e., that White had grabbed SD's scarf at the December 4, 2023, protest—and through making factual findings directly contradicted by the video evidence—i.e., the claim in TNS's final investigate report that surveillance footage showed no interaction between SD and White;

- Handling the procedures and administration of the grievance process in an arbitrary, inadequate, and unjust manner, culminating in dismissing White's claims of harassment without a reasonable basis for doing so;

- Refusing to take any reasonable action to resolve White's complaints of discrimination, such as punishing SD or any of his allies for their harassment or taking any steps to protect White from future harassment.

263.    TNS's adverse actions against White were caused by his complaints to TNS about the discriminatory harassment he suffered, as demonstrated by TNS's adverse actions and its abusive investigation process against White coming in the immediate wake of White's complaints and by TNS undertaking these actions in direct response to White's complaints about the discrimination against him and about the persistent issues he was experiencing with TNS's handling of the grievance process.

264.    TNS's retaliation against White harmed White directly and also exposed White to continued harm from SD and his allies' discriminatory harassment and retaliation against him, contributed to the hostile environment he suffered, and subjected him to a months-long, abusive grievance process that inflicted mental and emotional stress on White and severely interfered with his education.

265.    As a result of TNS's retaliation, White suffered mental and emotional distress, temporal and financial loss, interference with his education, and interference with his business opportunities.  Due to TNS's retaliation in refusing to address White's complaints and enforce its policies for his benefit, White no longer felt safe on campus, engaged therapists, and was disrupted in his coursework.

266.    TNS's retaliation in violation of the NYSHRL was the actual, direct, and proximate cause of White's injuries.

267.    White is further entitled to all relief available under the NYSHRL.

## COUNT VII
### New York Civil Rights Law § 40, *et seq*.
### Hostile Educational Environment

268.    Plaintiff repeats and incorporates by reference paragraphs 1–167 as if fully set forth herein.

269.    New York Civil Rights law entitles all persons to be protected from discrimination on the basis of national origin in any of their civil rights by any other person, corporation, or institution, or by the state.

270.    N.Y. Exec. Law § 291 recognizes the "opportunity to obtain education" and "the use of places of public accommodation" "without discrimination because of … national origin" as civil rights.

271.    TNS is a place of public accommodation by operation of N.Y. Civ. Rights Law § 40.

272.    TNS's actions, inactions, and/or deliberate indifference to the antisemitic and anti-Israeli harassment targeted against White based on his perceived identity as Jew and/or Israeli violated the protections owed to White under N.Y. Civ. Rights Law § 40.

273.    TNS had actual notice that White had been discriminatorily harassed based on the perception that he is Jewish and/or Israeli at the December 4, 2023, by SD and VS based on White's statements to Rabinovitz, Eichhorn, and Charles-Bowie in the days that followed the protest.

274.    Despite this actual notice of the discrimination against White, TNS failed to take meaningful and timely actions to protect White against discrimination, harassment, and retaliation directed against him on campus and during the grievance process.

275.    TNS failed to take any actions to protect White's access to classes on December 4, 2023, during the protest, and refused to protect him from physical force used against him by the protestors.

276.    TNS refused to apply its own policies and procedures to protect White from SD and VS's retaliatory harassment campaign after the December 4, 2023, protest.

277.    TNS refused to investigate White's Title VI complaints for approximately five months after he first started bringing them to TNS's attention.

278.    TNS's grievance process based on SD's and White's complaints was incompetently and inconsistently administrated and was conducted without professionalism or investigative integrity.

279.    TNS arbitrarily refused to provide White the protection services it maintains a policy of providing similarly situated students during grievance processes.

280.    TNS refused to impose any discipline or take any other actions in its final resolution of the grievance process to remedy the hostile environment White suffered.

281.    TNS's actions, inactions, and/or deliberate indifference facilitated the hostile environment against White in violation of TNS's statutory obligations under N.Y. Civ. Rights Law § 40.

282.    TNS's violations deprived White of the full benefits and use of TNS's educational programs and facilities.  White was denied the use of campus spaces on the basis of perceived religion and/or national origin through physical force and harassment and was subsequently targeted for discriminatory harassment in retaliation due to TNS's actions, inactions, and/or deliberate indifference.

283.    As a result of TNS's actions and inactions, White suffered mental and emotional distress, temporal and financial loss, interference with his education, and interference with his business opportunities. White no longer felt safe on campus, engaged therapists, and was disrupted in his coursework.

284.    TNS's actions, inactions, and/or deliberate indifference in permitting the harassment against White in violation of N.Y. Civ. Rights Law § 40 was the actual, direct, and proximate cause of White's injuries.

285.    White is entitled to the maximum statutory penalties available under N.Y. Civ. Rights Law § 40-d.

286.    Per New York Civil Rights Law § 40-d, Plaintiff will serve notice of this complaint upon the New York State Attorney General.

### COUNT VIII

**New York Civil Rights Law § 40, *et seq*.**
**Disparate Treatment**

287.    Plaintiff repeats and incorporates by reference paragraphs 1–167as if fully set forth herein.

288.    New York Civil Rights law entitles all persons to be protected from discrimination on the basis of national origin in any of their civil rights by any other person, corporation, or institution, or by the state.

289.    N.Y. Exec. Law § 291 recognizes the "opportunity to obtain education" and "the use of places of public accommodation" "without discrimination because of … national origin" as civil rights.

290.    TNS is a place of public accommodation by operation of New York Civil Rights Law § 40.

291.    TNS's disparate treatment of White based on his perceived identity as Jewish and/or Israeli in comparison to similarly situated students outside those protected classes violated the protections owed to White under N.Y. Civ. Rights Law § 40.

292.    TNS engaged in disparate treatment discrimination against Plaintiff White as a person perceived to be Jewish and/or Israeli in violation of New York Civil Rights Law by treating his complaints against SD based on the December 4, 2023, protest and the subsequent retaliation campaign protest differently from SD's and VS's similarly situated complaints against him based on the same protest.

293.    Following the December 4, 2023, protest, White brought his complaints about SD and the protestors' discriminatory conduct and interference with his access to his classes in violation of TNS policies to TNS's attention.

294.    TNS refused to open an investigation into SD or the other protestors based on White's complaints but immediately opened investigations into White based on SD's and VS's false complaints stemming from the same events.

295.    TNS further refused to enforce its No-Contact order and retaliation policies for White's protection after he brought SD and VS's retaliation campaign to TNS's attention, despite their conduct constituting clear policy violations.

296.    White repeatedly brought his complaints about the Title VI violations and the retaliation campaign to TNS throughout the grievance process for SD's complaint, but TNS continuously refused to investigate White's complaints.

297.    Even after TNS knew or should have known that White's complaints were true and that SD's were false and made in bad-faith after its review of the security camera footage and White's evidence, it still delayed opening a formal investigation into White's complaints and still continued its investigation against White based on SD's claims.

298.    When TNS finally began its formal investigation into White's Title VI complaints against SD, approximately five months after White first made them, it rushed the investigation and treated it with less interest and seriousness than it did SD's complaint against White.

299.    TNS arbitrarily refused to provide White the protection services it maintains a policy of providing similarly situated students during grievance processes.

300.    In TNS's final resolution of White's and SD's complaints, it improperly dismissed the matter without any discipline against SD or protection for White despite the clear evidence that SD and his allies had violated TNS's policies to target and harass White based on his perceived Jewish and/or Israeli identity and that SD's complaint was false and made in bad-faith as an extension of his discriminatory harassment against White.

301.    TNS's disparate treatment of White's and SD's complaints exposed White to continued harm from SD and his allies' discriminatory harassment and retaliation against him, contributed to the hostile environment he suffered, and subjected him to a months-long, abusive grievance process that inflicted mental and emotional stress on White and severely interfered with his education.

302.    As a result of TNS's disparate treatment, White suffered mental and emotional distress, temporal and financial loss, interference with his education, and interference with his business opportunities.  White no longer felt safe on campus, engaged therapists, and was disrupted in his coursework.

303.    TNS's disparate treatment against White was the actual, direct, and proximate cause of White's injuries.

304.    White is entitled to the maximum statutory penalties available under N.Y. Civ. Rights Law § 40-d.

305.    Per New York Civil Rights Law § 40-d, Plaintiff will serve notice of this complaint upon the New York State Attorney General.

<u>**COUNT IX**</u>
**New York Civil Rights Law § 40 *et seq.***
**Retaliation**

306.    Plaintiff repeats and incorporates by reference paragraphs 1-167 as if fully set forth herein.

307.    New York Civil Rights law entitles all persons to be protected from discrimination on the basis of national origin in any of their civil rights by any other person, corporation, or institution, or by the state.

308.    N.Y. Exec. Law § 291 recognizes the "opportunity to obtain education" and "the use of places of public accommodation" "without discrimination because of … national origin" as civil rights.

309.    TNS is a place of public accommodation by operation of New York Civil Rights Law § 40.

310.    258.    TNS discriminated against White in violation of New York Civil Rights law through retaliation against him for the protected activity of complaining to TNS about discriminatory harassment he suffered at TNS from SD, VS, and their allies at the December 4, 2023, protest and in their ensuing harassment campaign.

311.    White complained to TNS about the discriminatory harassment he suffered from SD, VS, and their allies in December 2023, and repeatedly sought TNS's intervention to investigate SD and his allies for discriminatory and harassing conduct against him based on the perception that he is Jewish and/or Israeli that violated TNS policies. White's complaints included specifically referring to TNS's obligations to prevent a discriminatory hostile environment against him based on perceptions of his identity under Title VI.

312. TNS retaliated against White for these complaints through adverse actions that include, but are not limited to, the following:

- Arbitrarily refusing to enforce its own policies that it should have enforced to protect him against continued harassment from SD and his allies;

- Refusing to provide an adequate investigation process for White's complaints;

- Refusing to dismiss the obviously false and malicious grievances against White brought by SD and VS despite having evidence directly contradicting their claims and corroborating White's statement of the events;

- Conducting the grievance process against White in a manner that was biased against White, including through the administrator overseeing the process making up claims against White that were neither reflected in the evidence nor alleged by White's accusers—i.e., that White had grabbed SD's scarf at the December 4, 2023, protest— and through making factual findings directly contradicted by the video evidence—i.e., the claim in TNS's final investigate report that surveillance footage showed no interaction between SD and White;

- Handling the procedures and administration of the grievance process in an arbitrary, inadequate, and unjust manner, culminating in dismissing White's claims of harassment without a reasonable basis for doing so;

- Refusing to take any reasonable action to resolve White's complaints of discrimination, such as punishing SD or any of his allies for their harassment or taking any steps to protect White from future harassment.

313. TNS's adverse actions against White were caused by his complaints to TNS about the discriminatory harassment he suffered, as demonstrated by TNS's adverse actions and its

abusive investigation process against White coming in the immediate wake of White's complaints and by TNS undertaking these actions in direct response to White's complaints about the discrimination against him and about the persistent issues he was experiencing with TNS's handling of the grievance process.

314.    TNS's retaliation against White harmed White directly and also exposed White to continued harm from SD and his allies' discriminatory harassment and retaliation against him, contributed to the hostile environment he suffered, and subjected him to a months-long, abusive grievance process that inflicted mental and emotional stress on White and severely interfered with his education.

315.    As a result of TNS's retaliation, White suffered mental and emotional distress, temporal and financial loss, interference with his education, and interference with his business opportunities.  Due to TNS's retaliation in refusing to address White's complaints and enforce its policies for his benefit, White no longer felt safe on campus, engaged therapists, and was disrupted in his coursework.

316.    TNS's retaliation against White was the actual, direct, and proximate cause of White's injuries.

317.    White is entitled to the maximum statutory penalties available under N.Y. Civ. Rights Law § 40-d.

318.    Per New York Civil Rights Law § 40-d, Plaintiff will serve notice of this complaint upon the New York State Attorney General.

**COUNT X**
**N.Y.C. Admin. Code § 8-107**
**Hostile Environment**

319. Plaintiff repeats and incorporates by reference paragraphs 1–167 as if fully set forth herein.

320. The New York City Human Rights Law ("NYCHRL") prohibits an agent or employee of any place or provider of public accommodation from directly or indirectly refusing, withholding from, or denying any person the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities, or privileges of the place or provider of public accommodation because of such person's actual or perceived national origin.

321. TNS is a "place or provider of public accommodation" under the NYCHRL.

322. TNS's actions, inactions, and/or deliberate indifference to the harassment of White on campus based on the perception that he is Jewish and/or Israeli, and the creation of a hostile environment constitute unlawful discrimination against White and denied White full and equal enjoyment of the advantages, services, facilities, and privileges of a public accommodation.

323. As a result of TNS's disparate treatment, White suffered mental and emotional distress, temporal and financial loss, interference with his education, and interference with his business opportunities. White no longer felt safe on campus, engaged therapists, and was disrupted in his coursework.

324. TNS's actions, inactions, and/or deliberate indifference in violation of the NYCHRL were the actual, direct, and proximate causes of White's injuries.

325. White is entitled to all available damages under N.Y.C. Admin. Code § 8-502(g), including punitive damages and attorneys' fee and costs.

326. White has damages in amounts to be determined at trial.

**COUNT XI**
**N.Y.C. Admin. Code § 8-107**

**Disparate Treatment**

327.    Plaintiff repeats and incorporates by reference paragraphs 1–167 as if fully set forth herein.

328.    The NYCHRL prohibits an agent or employee of any place or provider of public accommodation from directly or indirectly refusing, withholding from, or denying any person the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities, or privileges of the place or provider of public accommodation because of such person's actual or perceived national origin.

329.    TNS is a "place or provider of public accommodation" under the NYCHRL.

330.    TNS's disparate treatment of White's Title VI complaints based on the perception that he is Jewish and/or Israeli as compared to similarly situated students constitutes unlawful discrimination against White and denied White full and equal enjoyment of the advantages, services, facilities, and privileges of a public accommodation.

331.    TNS engaged in disparate treatment discrimination against Plaintiff White as a person perceived to be Jewish and/or Israeli in violation of the NYCHRL by treating his Title VI complaints against SD based on the December 4, 2023, protest and the subsequent retaliation campaign protest differently from SD's and VS's similarly situated complaints against him based on the same protest.

332.    Following the December 4, 2023, protest, White brought his complaints about SD and the protestors' discriminatory conduct and interference with his access to his classes in violation of TNS policies to TNS's attention.

333.    TNS refused to open an investigation into SD or the other protestors based on White's complaints but immediately opened investigations into White based on SD's and VS's false complaints stemming from the same events.

334.    TNS further refused to enforce its No-Contact order and retaliation policies for White's protection after he brought SD and VS's retaliation campaign to TNS's attention, despite their conduct constituting clear policy violations.

335.    White repeatedly brought his complaints about the Title VI violations and the retaliation campaign to TNS throughout the grievance process for SD's complaint, but TNS continuously refused to investigate White's complaints.

336.    Even after TNS knew or should have known that White's complaints were true and that SD's were false and made in bad-faith after its review of the security camera footage and White's evidence, it still delayed opening a formal investigation into White's complaints and still continued its investigation against White based on SD's claims.

337.    When TNS finally began its formal investigation into White's Title VI complaints against SD, approximately five months after White first made them, it rushed the investigation and treated it with less interest and seriousness than it did SD's complaint against White.

338.    TNS arbitrarily refused to provide White the protection services it maintains a policy of providing similarly situated students during grievance processes.

339.    In TNS's final resolution of White's and SD's complaints, it improperly dismissed the matter without any discipline against SD or protection for White despite the clear evidence that SD and his allies had violated TNS's policies to target and harass White based on his perceived Jewish and/or Israeli identity and that SD's complaint was false and made in bad-faith as an extension of his discriminatory harassment against White.

340.     TNS's disparate treatment of White's and SD's complaints exposed White to continued harm from SD and his allies' discriminatory harassment and retaliation against him, contributed to the hostile environment he suffered, and subjected him to a months-long, abusive grievance process that inflicted mental and emotional stress on White and severely interfered with his education.

341.     As a result of TNS's disparate treatment, White suffered mental and emotional distress, temporal and financial loss, interference with his education, and interference with his business opportunities.  White no longer felt safe on campus, engaged therapists, and was disrupted in his coursework.

342.     TNS's disparate treatment against White was the actual, direct, and proximate cause of White's injuries.

343.     White is entitled to all available damages under N.Y.C. Admin. Code § 8-502(g), including punitive damages and attorneys' fee and costs.

344.     White has damages in amounts to be determined at trial.

## COUNT XII
### N.Y.C. Admin. Code ¶ 8-107
### Retaliation

345.     Plaintiff repeats and incorporates by reference paragraphs 1-167 as if fully set forth herein.

346.     The NYCHRL prohibits an agent or employee of any place or provider of public accommodation from directly or indirectly refusing, withholding from, or denying any person the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities, or privileges of the place or provider of public accommodation because of such person's actual or perceived national origin.

347.    TNS is a "place or provider of public accommodation" under the NYCHRL

348.    TNS discriminated against White in violation of the NYCHRL through retaliation against him for the protected activity of complaining to TNS about discriminatory harassment he suffered at TNS from SD, VS, and their allies at the December 4, 2023, protest and in their ensuing harassment campaign.

349.    White complained to TNS about the discriminatory harassment he suffered from SD, VS, and their allies in December 2023, and repeatedly sought TNS's intervention to investigate SD and his allies for discriminatory and harassing conduct against him based on the perception that he is Jewish and/or Israeli that violated TNS policies. White's complaints included specifically referring to TNS's obligations to prevent a discriminatory hostile environment against him based on perceptions of his identity under Title VI.

350.    TNS retaliated against White for these complaints through adverse actions that include, but are not limited to, the following:

- Arbitrarily refusing to enforce its own policies that it should have enforced to protect him against continued harassment from SD and his allies;

- Refusing to provide an adequate investigation process for White's complaints;

- Refusing to dismiss the obviously false and malicious grievances against White brought by SD and VS despite having evidence directly contradicting their claims and corroborating White's statement of the events;

- Conducting the grievance process against White in a manner that was biased against White, including through the administrator overseeing the process making up claims against White that were neither reflected in the evidence nor alleged by White's accusers—i.e., that White had grabbed SD's scarf at the December 4, 2023, protest—

and through making factual findings directly contradicted by the video evidence—i.e., the claim in TNS's final investigate report that surveillance footage showed no interaction between SD and White;

- Handling the procedures and administration of the grievance process in an arbitrary, inadequate, and unjust manner, culminating in dismissing White's claims of harassment without a reasonable basis for doing so;

- Refusing to take any reasonable action to resolve White's complaints of discrimination, such as punishing SD or any of his allies for their harassment or taking any steps to protect White from future harassment.

351.    TNS's adverse actions against White were caused by his complaints to TNS about the discriminatory harassment he suffered, as demonstrated by TNS's adverse actions and its abusive investigation process against White coming in the immediate wake of White's complaints and by TNS undertaking these actions in direct response to White's complaints about the discrimination against him and about the persistent issues he was experiencing with TNS's handling of the grievance process.

352.    TNS's retaliation against White harmed White directly and also exposed White to continued harm from SD and his allies' discriminatory harassment and retaliation against him, contributed to the hostile environment he suffered, and subjected him to a months-long, abusive grievance process that inflicted mental and emotional stress on White and severely interfered with his education.

353.    As a result of TNS's retaliation, White suffered mental and emotional distress, temporal and financial loss, interference with his education, and interference with his business opportunities.  Due to TNS's retaliation in refusing to address White's complaints and enforce its

policies for his benefit, White no longer felt safe on campus, engaged therapists, and was disrupted in his coursework.

354.    TNS's retaliation in violation of the NYCHRL is the actual, direct, and proximate causes of White's injuries.

355.    White is entitled to all available damages under N.Y.C. Admin. Code § 8-502(g), including punitive damages and attorneys' fee and costs.

356.    White has damages in amounts to be determined at trial.

## COUNT XIII

### Breach of Contract

357.    Plaintiff repeats and incorporates by reference paragraphs 1–167 as if fully set forth herein.

358.    TNS entered into express and implied contracts with White through its policies and procedures governing student conduct, discrimination, harassment, retaliation, and the grievance process.

359.    New York law recognizes an implied contract between students and the university they attend, which is created upon enrollment.

360.    White complied with his contractual obligations.

361.    TNS breached its express and implied contracts with White.

362.    Specifically, TNS violated regulations and policies it enacted with respect to the safety and well-being of its student population and the prevention of discrimination, harassment, and retaliation against them, including but not limited to:

- **Students' Bill of Rights:** The Students' Bill of Rights states that "all students have the right to," among other things:
    i.    "Be free from any suggestion that the reporting individual is at fault when [] crimes and violations are committed, or should have acted in a different manner toa void such crimes or violations;"

    ii.  "Be protected from retaliation by the institution, any student, the accused and/or the respondent, and/or their friends, family and acquaintances within the jurisdiction of the institution;"

    iii.  "Exercise civil rights and practice of religion without interference by the investigative, criminal justice, or judicial or conduct process of the institution."

- **Student Code of Conduct:** The Student Code of Conduct regulates student conduct at TNS and prohibits the following as conduct violations "subject to sanctions:"

    i.  **Disorderly Conduct: "**Disorderly conduct includes, but is not limited … conduct that is unreasonable in the time, place, or manner in which it occurs; and obstruction or disruption of university-sponsored activities; or conduct which adversely affects the student's suitability as a member of the university community or which is inconsistent with the mission of the university."

    ii.  **Bias Related Conduct:**

"a. Bias related harassment or discrimination believed to be motivated by a consideration (real or perceived) based on race, color, age, religion, national origin, disability, sexual orientation, gender identity or other protected characteristics such as oral, written, graphic or physical conduct relating to an individual's race, color, gender identity, national origin (including an individual's ancestry, country of origin, or country of origin of the student's parents, family members or ancestors) or other protected characteristics that is sufficiently severe, pervasive, or persistent so as to interfere with or limit the ability of an individual to participate in or benefit from the College programs or activities.

b. Threatening, intimidating or fear provoking behavior directed towards another believed to be motivated by a consideration (real or perceived) of race, color, age, religion, national origin, disability, sexual orientation, gender identity or other protected characteristics such as oral, written, graphic or physical conduct relating to an individual's race, color, gender identity, national origin (including an individual's ancestry, country of origin, or country of origin of the student's parents, family members or ancestors) or other protected characteristics that is sufficiently severe , pervasive, or persistent so as to interfere with or limit the ability of an individual to participate in or benefit from the College programs or activities."

    iii.  **Harassment: "**Harassing includes, but is not limited to, verbal, written, or electronic actions that are abusive to any person; conduct which threatens or endangers the health or safety of any person; inappropriate touching or physical contact with another person. Sex or gender-based harassment falls under the Sexual Misconduct and Violence Policy. Harassing conduct based on an individual's protected category or perceived protected category falls under the Discriminatory Harassment Policy.

This violation also includes the act of Doxing or Doxxing. Doxing (or doxxing) is the malicious act of publicly revealing someone's private or personally identifiable information online or public locations without their consent. This information can

include, without limitation, someone's private email address, phone number, home address, family address, financial details or sensitive documents."

    **iv. Disruptive, Threatening, and Abusive Behavior:**

        **a. Unreasonable and Excessive Noise**

        "Creating noise as deemed unreasonable or excessive by university staff on university-owned or controlled property is prohibited. Unreasonable and excessive noise includes, but is not limited to, noise that can be heard beyond a student's room or suite. The playing of musical instruments in areas other than those deemed appropriate by the university for such activities is prohibited."

        **b. Safety of Others**

        "No person shall create conditions that endanger or threaten others or their property or create a health and safety hazard, including but not limited to physical actions, verbal or written statements. Additionally, tampering with, disabling, covering or blocking campus security cameras is prohibited."

        **c. Bullying**

        "Behaviors that are repetitive, pervasive, and egregious and intended to intimidate, harass, frighten, insult, threaten, or otherwise harm an individual psychologically or physically. Bullying behaviors can also occur in virtual settings, which include but are not limited to, texts, emails, and online posts."

        **d. Physical Violence**

        "Intentionally inflicting bodily harm upon any person; taking reckless action that results in harm to any person; or threatening by any means of transmission the use of force to harm or injure any person."

        **e. Camping/Blocking Entries or Exits**

        "Temporary structures, such as tents are prohibited in all campus buildings. Similarly, camping or sleeping overnight in any publicly accessible area of campus, including outdoor space controlled by the New School, whether in vehicles, tents, or otherwise is also prohibited. Blockage of entryways and exits are prohibited at any locations owned and managed by The New School."

    **v. Non-Compliance:**

    "Non-compliance is the failure to comply with directions of university officials acting in the performance of their duties; failure to abide by or fulfill the terms of a sanction, interim measure or disciplinary outcome issued through the conduct process."

- **Policy on Harassment, Discrimination, Prohibited Relationships, Title IX and Non-Title IX Sexual Harassment and Misconduct:**

    **i. Discrimination:** TNS's policy on non-Title IX discrimination prohibits discrimination and discriminatory harassment. It defines "discrimination" as "any action that deprives or tends to deprive individuals of educational or employment access, benefits or opportunities on the basis of the individual's

actual or perceived protected status, … or practice that adversely impacts members of one protected class more than others."  "Discriminatory harassment" is defined as "unwelcome conduct that creates an intimidating, hostile or abusive work, academic, student residential or co-curricular environment; alters the conditions of employment or education or unreasonably interferes with an individual's work or academic performance on the basis of the individual's actual or perceived membership in a protected class. Harassment may include, but is not limited to:

1. verbal abuse, epithets, slurs or negative stereotyping
2. threatening, intimidating or hostile acts
3. denigrating jokes
4. obscene comments or gestures
5. offensive or derogatory displays or circulations (including electronic) in the work, academic or student residential environment
6. written or graphic material that disparages or shows hostility or aversion toward an individual or group"

ii. **Retaliation:** "Retaliation is an intentional adverse action or threatened action taken by an accused individual or allied third party that harms or attempts to harm another individual as reprisal for filing a complaint, supporting a complainant or otherwise participating in a proceeding pursuant to this policy. Retaliation includes intimidating, threatening, disparaging, coercing or in any way discriminating against an individual as reprisal for the individual's complaint or participation in an investigation or proceeding.

Retaliation is an offense separate and apart from the underlying policy violation and will be considered and acted upon independently. The New School will not tolerate any retaliation against an individual or group for making a complaint of harassment or discrimination in good faith under this policy or for participating in an investigation."

iii. **Notice:** "Regardless of whether a complainant files a complaint or requests action, if the University has notice of discrimination or harassment, as outlined in this policy, a prompt, thorough and impartial investigation of the allegations will be commenced."

iv. **Investigations for Non-Title IX Allegations:** "Upon receipt of a complaint (or notice) of discrimination, harassment or retaliation, an investigation of the allegations will be commenced. The investigation will be conducted in a prompt, thorough and impartial manner, and may include:

1. Interviews with the complainant and the accused
2. Interviews of relevant witnesses
3. Consideration of relevant evidence, including information submitted by either party
4. If the accused is a member of any bargaining unit, they are entitled to have a union representative accompany them to the interview. The union representative may appear only in an advisory capacity and may not actively participate in the proceedings.

5.  Either party may be accompanied to the interview by an advisor of choice. The advisor of choice may appear only in an advisory capacity and may not actively participate in the proceedings.
6.  The investigator will make every effort to keep the complainant informed about the status of the investigation."

**v.  <u>Interim Measures</u>**
"At any time during the investigation, the investigator may recommend reasonable interim protections or measures for the parties involved. These measures may include separating the parties, placing limitations or restrictions, no-contact orders, suspension, alternative workplace schedules, student residential housing adjustments, transportation or academic accommodations or adjustments.

These measures are available regardless of whether the complainant pursues a complaint under this policy. Efforts will be made to minimize the burden on the complainant whenever practicable. Upon reasonable request, the accused and/or complainant will be afforded a prompt review of the interim measures, including potential modification. Either party will be permitted to submit evidence in support of such request.

**vi.  <u>Determinations and Resolutions for Non-Title IX Cases</u>**
"The investigator/s will complete the investigation in a timely fashion and render a determination based upon the preponderance of the evidence. The preponderance of the evidence means that what is sought to be shown, is more likely than not to have occurred. All parties to the investigation (complainant and accused) will receive a written determination of the outcome of the investigation.

**vii.  <u>False Complaints</u>**
"A complainant who knowingly makes false allegations against a member of the University community in bad faith will be subject to disciplinary action. An inquiry into a false complaint may be resolved through a separate investigation."

363.  TNS breached its express and implied contracts with White by failing to perform under its policies and enforce the commitments reflected within them to provide White a campus free from unlawful discrimination, harassment, and interference with his education, and to protect him from retaliation during the grievance process.

364.  On December 4, 2023, TNS breached its express and implied contracts with White to protect students from discrimination, harassment, and interference with their education, in violation of TNS's policies.  As SJP and its protestors blockaded the University Center and used physical force to deny White and other students access to educational resources, TNS refused to intervene despite having security personnel on-site.  TNS then violated its express and implied

contracts by refusing to address White's Title VI complaints in a timely and meaningful manner, while allowing SD's and VS's bad-faith complaints against White to proceed, and by refusing to enforce its No-Contact order and retaliation policies for White's protection against SD and VS's retaliatory harassment campaign.   TNS further violated these contracts when it handled the grievance incompetently and unprofessionally, dragging it out needlessly, changing standards, procedures, and timelines without explanation or justification, and resolving the process without any discipline imposed on SD or SJP for discriminating against White and for filing a false complaint, and without taking any steps to otherwise address the discrimination against White.

365.   TNS also breached the implied covenant of good faith and fair dealing inhering in every contract through its failure to enforce its policies and procedures against the harassment, discrimination, and retaliation against White, and by administrating its grievance process in an unprofessional and haphazard manner that undermined its integrity.

366.   As a result of TNS's breaches of express and implied contracts, White's rights, including his right to a safe educational environment free of discrimination, harassment, retaliation, and interference with his education, and his right to an impartial, competent, and just grievance process were violated.   White suffered mental and emotional distress, temporal and financial loss, interference with his education, and interference with his business opportunities. He no longer felt safe on campus, engaged therapists, and was disrupted in his coursework.

367.   TNS's breach of express and implied contracts was the actual, direct, and proximate cause of White's injuries.

368.   White has been damaged in an amount to be determined at trial.

## **JURY TRIAL DEMANDED**

Plaintiff White hereby demands a jury trial for all issues so triable.

128

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff White prays and requests that a judgment be entered in his favor and against The New School awarding him:

a)      Compensatory, consequential, and punitive damages in amounts to be determined at trial;

b)      Statutory penalties for, but not limited to, violations of N.Y. Civ. Rights Law § 40-c, pursuant to N.Y. Civ. Rights Law § 40-d;

c)      White's attorneys' fees, the costs of suit, and expenses;

d)      Pre-judgment interest and post-judgment interest at the maximum rate allowable by law; and

e)      Such other and further relief as the Court deems just and proper.

Respectfully submitted,

/s/ Jacob William Roth
Jacob William Roth, Esq.
Admitted *Pro Hac Vice*
JRoth@Dhillonlaw.com
561.227.4959
Matthew Seth Sarelson, Esq.
msarelson@dhillonlaw.com
415.433.1700
**DHILLON LAW GROUP, INC.**
1601 Forum Place, Suite 403
West Palm Beach, Florida 33401

*Counsel for the Plaintiff*