**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **BRANDON WHITE,** | |
| **Plaintiff,** | **25-cv-2910 (ALC)** |
| **-against-** | |
| **THE NEW SCHOOL,** | **OPINION & ORDER[1]** |
| **Defendant.** | |

**ANDREW L. CARTER, JR., United States District Judge:**

Plaintiff Brandon White ("Plaintiff") brings this action against Defendant The New School ("Defendant" or "TNS") alleging (1) race and national origin discrimination in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, *et seq.*; (2) religious and national origin discrimination in violation of New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296, *et seq.*, New York State Civil Rights Law ("NYSCRL"), N.Y. Civ. Rights Law § 40, *et seq.*, and New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107; and (3) breach of contract. Defendant now moves for dismissal of Plaintiff's First Amended Complaint ("FAC"), ECF No. 25, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, ECF No. 28.

This is a case concerning a pro-Palestine protest at The New School, where Plaintiff was, at the time, an undergraduate student. Plaintiff claims to have experienced antisemitic harassment and discrimination by student protestors while attempting to access a university building. Plaintiff sues The New School, arguing that it failed to protect him from antisemitism and that it handled his grievances in an unlawful manner under Title VI of the Civil Rights Act of 1964.

---

[1] The substance of Plaintiff's lawsuit requires the Court to evaluate explicit words that may be considered offensive or derogatory.

Plaintiff, however, is neither Jewish nor Israeli. This fact is critical, not because it is automatically fatal to his claim of antisemitism – it is not. Rather, it is critical because Plaintiff bases his claim on allegations that he was *perceived* by the student protestors to be Jewish and/or Israeli and that he was harassed and discriminated against on this basis. At this early stage of litigation, Plaintiff must include facts in his complaint that support these assertions. Without this factual substance, his claims are unactionable. Plaintiff fails to meet this standard, and his complaint is not sufficient to survive this motion.

After careful review, Defendants' motion to dismiss is **GRANTED**.

## BACKGROUND

### I. Factual Background

Plaintiff's First Amended Complaint ("FAC") states that he was an undergraduate student at The New School ("TNS") at the time of the alleged discriminatory conduct. *See* FAC ¶ 37. On December 4, 2023, students, staff, and faculty members at TNS organized under the campus group Students for Justice in Palestine ("SJP") led a protest of Israel's response to the Hamas terrorist attacks on October 7, 2023. *Id*. ¶ 38. The protest involved a human blockade of the main entrance, and several alternative entrances, to the University Center in violation of TNS's Demonstration Guidelines. *Id*. ¶¶ 38-39. Plaintiff contends that, on the day of the blockade, he was prevented from entering the University Center to attend a class; was assaulted and slurred by SJP's then-president, "SD," and a TNS teaching assistant, "VS"; and was subject to a retaliatory harassment campaign by the demonstrators and their affiliates. *Id*. ¶ 37.

Plaintiff states that he is neither Jewish nor Israeli, but that he was targeted by student protestors because of their perception of him as Jewish and/or Israeli. *Id*. ¶ 37. Specifically, Plaintiff claims that, based on his appearance, he was referred to derogatorily as a "Zio" (short for

"Zionist") by SD, VS, and their affiliates during and after the December 4, 2023, protest. *Id*. ¶ 46. Plaintiff contends that the intended use of this term was as an antisemitic slur. *Id*. Plaintiff further alleges that other individuals, including a "visibly Jewish" student and a prospective student visiting from Israel, were targeted with similarly hostile rhetoric. *Id*. ¶ 51.

Immediately following their altercation with Plaintiff at the December 4, 2023 protest, SD and VS posted photos of Plaintiff from the protest on Instagram and claimed that Plaintiff had assaulted SD and called him a "fa***t." *Id*. ¶ 53. Plaintiff contends that these posts incited an online retaliation campaign against Plaintiff which lasted for weeks and months. *Id*. ¶ 56.

On the evening of the day of the protest, Plaintiff emailed several lead administrators at TNS to notify them of the altercation between Plaintiff and SD. *Id*. ¶¶ 59-60. On December 5, 2023, TNS Interim President Donna Shalala informed Plaintiff that his complaints had been forwarded to the Office of Student Conduct and Community Standards for review. *Id*. ¶¶ 65.

On December 7, 2023, Plaintiff received two emails from TNS's Student Title IX Investigator, Cassita Charles-Bowie, informing Plaintiff that he was under investigation based on complaints from SD and VS stating Plaintiff had engaged in hate speech, discrimination based on sex/sexual identity, and physical assault. *Id*. ¶ 67. Plaintiff denies these allegations as "false" and retaliatory. *Id*. Charles-Bowie attached a No-Contact order to SD's complaint prohibiting Plaintiff and SD from contact with one another on or off campus and stated that the parties refrain from harassment, retaliation, or intimidating behavior. *Id*. ¶ 72.

Despite having corresponded with TNS administration several times following the December 4, 2023, protests, Plaintiff only first mentions that he felt targeted by SD and VS "as [J]ewish" in a December 7, 2023, email to his professor, Robert Rabinovitz, explaining Plaintiff's tardiness to class. *Id*. ¶ 80. In this email, Plaintiff explains to Professor Rabinovitz that Plaintiff

3

was "dealing with false allegations toward [him] from the day of the pro [P]alestine walkout/barricade" and that he "[felt] very bad for what's going on towards the [J]ewish community." *Id*. He continues: "Not only do I know how my friends feel, I learned first hand [*sic*]." *Id*.

Starting on December 8, 2023, in separate meetings with TNS's Dean Kate Eichhorn and Charles-Bowie, Plaintiff explained that he felt he had experienced discriminatory harassment and assault based on other students' perception of him as Jewish and/or Israeli. *Id*. ¶¶ 85-86, 94.

Plaintiff did not hear from Charles-Bowie about the allegations against him again until February 5, 2024, despite Plaintiff's many attempts to receive an update. *Id*. ¶ 96. Charles-Bowie explained that she had been on jury duty and informed Plaintiff that he should expect a preliminary report within the next week. *Id*. The investigations stalled again in March because Charles-Bowie had been suffering from an illness. *Id*. ¶ 107.

On March 18, 2024, Charles-Bowie shared the final investigative report of the Title IX complaints and video surveillance footage from the date of the protest with Plaintiff via Google Docs. *Id.* ¶ 120. An accompanying message informed Plaintiff that Student Conduct and Community Standards determined that the case would proceed via administrative adjudication, rather than a hearing, in order to expedite the process. *Id*. Charles-Bowie further explained that Plaintiff's formal complaint against SD was underway and the report for Plaintiff's complaint was in progress. *Id*. Upon review of the evidentiary record in the final report, Plaintiff noticed a name he did not recognize, prompting him to reach out to Charles-Bowie. *Id*. ¶¶ 122-23. Charles-Bowie explained that the inclusion of this name was a mistake, and the individual was a part of a separate, unrelated investigation. *Id*. ¶ 124.

On April 4, 2024, TNS Director of Student Conduct Kamla Holland sent Plaintiff an email introducing herself and asking to schedule an initial meeting with Plaintiff regarding his Title VI concerns. *Id*. ¶ 129. Plaintiff began corresponding with Holland as well as Charles-Bowie about this Title VI grievance process. *Id*.

On April 22, 2024, Plaintiff sent an email to Charles-Bowie, Holland, and TNS Assistant Dean Joe Hosking requesting security and campus escort services, fearing recent escalations in SJP's campus protests. *Id*. ¶¶ 155-56. On April 23, 2024, Charles-Bowie responded that she would request increased security and monitoring around the main entrance to the University Center but noted that escort services were not available, despite being offered in an earlier email to Plaintiff. *Id*. ¶ 157.

On May 1, Plaintiff received a decision letter from Holland adjudicating his and SD's claims against one another. *Id*. ¶ 161. The decision letter ended the matter without imposing any disciplinary sanctions against either party. *Id*. The letter did not mention Title VI or discrimination. *Id*.

Plaintiff contends that, as a result of TNS's actions and inactions, he suffered mental and emotional distress, temporal and financial loss, interference with his education, and interference with his business opportunities. He no longer felt safe on campus, engaged therapists, and was disrupted in his coursework. *Id*. ¶ 186.

## II.    Procedural History

Plaintiff filed his first Complaint on April 8, 2025. ECF No. 1. Defendant filed a Motion to Dismiss Plaintiff's first Complaint on July 18, 2025. ECF No. 18. On August 22, 2025, Plaintiff filed a letter requesting leave to amend his Complaint. ECF No. 22. On September 5, 2025, the Court granted Plaintiff leave to amend his Complaint. ECF No. 24.

5

On September 8, 2025, Plaintiff filed his First Amended Complaint. ECF No. 25. On October 10, 2025, Defendant filed its Motion to Dismiss the FAC. ECF No. 28. Plaintiff filed his Opposition on November 7, 2025. ECF No. 30. Defendant filed its Reply on November 21, 2025. ECF No. 31.

**STANDARD OF REVIEW**

When resolving a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court should "draw all reasonable inferences in Plaintiffs' favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks and citations omitted). Thus, "[t]o survive a motion to dismiss [under Rule 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). However, the court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

**DISCUSSION**

## I.   Plaintiff's Title VI Claims

### a.   Plaintiff Does Not Plausibly Allege Harassing Conduct Cognizable Under Title VI

Title VI of the Civil Rights Act of 1964 prohibits a recipient of federal funds from discriminating on the basis of race, color, or national origin. *See* 42 U.S.C. § 2000d. In order to state a claim under Title VI, a plaintiff must allege (1) that he was discriminated against on one of

the bases proscribed by the statute; (2) that the discrimination was intentional; and (3) that the discrimination was a substantial and motivating factor for the defendant's conduct. *See Manolov v. Borough of Manhattan Cmty. Coll.*, 952 F. Supp. 2d 522, 531 (S.D.N.Y. 2013) (citing *Tolbert v. Queens Coll.*, 242 F.3d 58, 69 (2d Cir. 2001)). Plaintiff fails to state a claim under Title VI, because he does not plausibly allege that he was discriminated against on the basis of race or national origin.

Courts have found that antisemitic harassment and discrimination against Jewish persons amount to racial discrimination under Title VI. *See T.E. v. Pine Bush Cent. Sch. Dist.*, 58 F. Supp. 3d 332, 354 (S.D.N.Y. 2014) (holding that antisemitic harassment against a Jewish plaintiff is actionable under Title VI). Plaintiff claims that race and national origin discrimination "includes discrimination against those who identify as *or are perceived to be* Jewish as well as those who identify as *or are perceived to have* Israel as their homeland." *See* FAC ¶ 191 (emphasis added). Defendant TNS flatly rejects this interpretation of Title VI, pointing to the plain language of the statutory text, which does not mention perception of race or national origin as a possible basis for such a claim.; *see* 42 U.S.C. § 2000d. TNS argues that because Congress used its Spending Clause powers to pass Title VI, claims are only available where the "clear terms" of the statute are violated. *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 641–42 (1999)). Additionally, because Plaintiff is not actually Jewish or Israeli, TNS's argues his Title VI claims fail, even if he was perceived by his alleged harassers as such.

Contrary to TNS's assertions, however, courts have routinely animated the principle that the mistaken perception of an individual's race or national origin may, in certain circumstances, support an actionable Title VI complaint. *See, e.g.*, *Capek v. BNY Mellon, N.A.,* 2016 WL 2993211 (S.D.N.Y. May 23, 2016) (holding a non-Jewish employee perceived to be Jewish made out a

cognizable discrimination claim under Title VII); *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655 (2d Cir. 2012) (finding a half-white, half-Latino plaintiff subject to anti-Black discrimination able to claim under Title VI); *Evans v. Cabot Sch. Dist.*, No. 4:19-CV-00525-KGB, 2023 WL 3177896 (E.D. Ark. Feb. 1, 2023), *aff'd in part, rev'd in part and remanded*, 114 F.4th 946 (8th Cir. 2024) (holding plaintiffs adopted from Cambodia but subjected to Islamophobic harassment successfully claimed Title VI protections).

In order for cases involving misperceived race or national origin to survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead facts which support the plausibility of an inference that the plaintiff was perceived as a certain race or national origin by their alleged harassers. For example*,* in *Capek*, the plaintiff pleaded that her former manager told her, "[a]ll this time [he] thought [she was] Jewish" and did not deny that his perception of her race was the reason for his discriminatory conduct. 2016 WL 2993211, at *1. In *Jones v. UPS Ground Freight,* the plaintiff pleaded that he had explained to the employee training him that he was African American, not Native American, after the plaintiff was subjected to anti-indigenous remarks, to which the employee responded that "[he has] trained [his] kind before." 683 F.3d 1283, 1288 (11th Cir. 2012). Facts about a plaintiff's physical characteristics or cultural practices are well pleaded when they support a plausible inference that the plaintiff was wrongfully perceived as belonging to a certain race or national origin. *Id.* at 1300 (finding a complaint well pleaded because the plaintiff emphasized his darker complexion and other physical attributes commonly connoted with Native American appearances); *See also Evans*, 2023 WL 3177896 (noting that plaintiffs' "brown skin and black hair" were described in complaint); *E.E.O.C. v. WC&M Enters., Inc.,* 496 F.3d 393, 397 (5th Cir. 2007) (connecting plaintiff's appearance as an Indian man and religious and cultural practices as a Muslim to the anti-Arab racial harassment he alleged). To this end, the Court in

*WC&M*, cited by Plaintiff White here, relies on the U.S. Equal Employment Opportunity Commission's guidelines on discrimination, which do not specifically require discrimination claims to be based on the victim's actual national origin, but do state that it "is enough to show that the complainant was treated differently *because of his or her foreign accent, appearance, or physical characteristics*." 496 F.3d at 401 (citing Guidelines on Discrimination Because of National Origin, 45 Fed.Reg. 85,632, 85,633 (Dec. 29, 1980)) (emphasis added); *see also* 29 C.F.R. § 1606.1 (detailing how shared physical, cultural or linguistic characteristics of a national origin group can support a national origin discrimination claim).

In *Pine Bush*, a case on which Plaintiff relies to support his assertion that discrimination on the basis of perceived Jewish identity is actionable under Title VI, the plaintiffs — all actually Jewish — each asserted numerous counts of severe and pervasive harassment that clearly indicated plaintiffs were known or perceived to be Jewish. *See Pine Bush*, 58 F. Supp. 3d at 377. These acts of harassment included students throwing change at plaintiffs, drawing swastikas on school premises and student property, physically assaulting and threatening plaintiffs, and calling plaintiffs "countless" blatantly antisemitic slurs including "'dirty j*w,' 'filthy j*w,' 'stupid J*w,' 'fat J*w,' 'J*w f****t,' 'f*cking J*w k*ke,' 'ashes,' 'dust,' and 'm*cky f*ck.'" *See id.*, at 340. The harassment lasted several years and was experienced on an almost daily basis by several Jewish students at the school. *See id.*, *passim*. The plaintiffs' complaint contained factual allegations of the harassment that unquestionably supported the conclusion that each plaintiff was known or perceived to be Jewish and was discriminated against on this basis. *See id.*

In the present case, however, Plaintiff has not alleged facts tending to support the inference that his harassers perceived him as Jewish and/or Israeli. The FAC does not allege that SD or VS stated that they had assumed Plaintiff was Jewish and/or Israeli and that such an assumption was

the impetus for their conduct towards Plaintiff. Nor does the FAC mention facts about Plaintiff's accent, appearance, cultural characteristics, or physical characteristics, let alone how any of these or other qualities could suggest that he was perceived as Jewish and/or Israeli by SD and VS. Plaintiff claims that the harassment was *specifically* antisemitic in nature. However, Plaintiff is neither Jewish nor Israeli, and the FAC does not sufficiently plead facts to support the plausibility of the inference that the demonstrators perceived him as such.

The only fact alleged about Plaintiff's "appearance" is that he has one. Yet the FAC fails to mention a single detail about Plaintiff's appearance that supports his assertion that he was perceived as Jewish and/or Israeli by the protestors. Absent any fact to this effect, Plaintiff's claim that he was perceived as Jewish and/or Israeli is rendered conclusory. Nevertheless, in attempt to support his assertion, Plaintiff claims that SD targeted "Jewish" students, including harassing a "visibly Jewish" student during the December 4, 2023 protests. FAC ¶ 51. However, Plaintiff does not compare his own appearance to that of the "visibly Jewish" student to make the inclusion of this detail relevant.

Plaintiff's assertion that he and other students were targeted based on a perception of them as Jewish and/or Israeli are further belied by his own factual allegations. *See Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995) ("[C]onclusory allegations need not be credited, however, when they are belied by more specific allegations of the complaint."). The FAC includes photos and descriptions of video footage from the day of the protest which show that the demonstrators aggressively blocked several other students — whose actual or perceived race or national origin were noticeably absent from the FAC — from entering the University Center, at 16-24.[2] The FAC also includes an excerpt from an email sent to Plaintiff by Dean Eichhorn

---

[2] These are the page numbers, rather than the paragraphs, from the FAC.

immediately following the December 4, 2023, protest, in which Eichhorn writes that Plaintiff "was not the only student who was impacted" by the action at the University Center, with no mention that the others impacted were Jewish and/or Israeli or perceived as such, ¶ 61. Unless the Court assumes all students who were blocked from entering the University Center that day were perceived by SD and VS to be Jewish and/or Israeli, an assumption the FAC does not go so far to make or even insinuate, the FAC's well-pleaded facts undercut Plaintiff's assertion that he was discriminated against on the basis of his perceived race or national origin.

A close look at the timeline of events, as pleaded, also undermines Plaintiff's own conclusions as to the antisemitic bases of the harassment he experienced. The FAC at ¶ 80 shows that Plaintiff only first mentions to anyone that he felt "targeted as [J]ewish" several days after the December 4, 2023, protests, which Plaintiff himself characterizes as "pro [P]alestine" — not "anti-Israel" or "antisemitic" — in his email. Notably, Plaintiff sent this email to Professor Rabinovitz after he received notice that he was under investigation following SD and VS's complaints to TNS. Despite having corresponded about the protest several times with TNS administrators, no email prior to the initiation of Title IX investigations against Plaintiff alleges, let alone mentions, antisemitism or the use of the word "Zio." Plaintiff failed to suggest antisemitism to anyone at TNS before the Title IX investigations were launched against him.

It is the case that SD called Plaintiff a "Zio" just before he was shoved out of the University Center, as well as on social media following the protest. Plaintiff contends that this term was used as an antisemitic slur based on Plaintiff's "appearance." FAC ¶ 46. However, the term "Zio" or "Zionist" is not antisemitic or racially derogatory "on its face." *See Big Apple Tire, Inc. v. Telesector Res. Grp., Inc.*, 476 F. Supp. 2d 314, 327 (S.D.N.Y. 2007) (finding racially-ambiguous, sporadic remarks insufficient evidence of race discrimination or harassment under 42 U.S.C.A. §

1981). The FAC never defines "Zionist," "Zionism," or "anti-Zionism," terms that are hotly contested. Such an "absence of consensus…reflects ongoing debate as to the relationship between anti-Zionism and antisemitism — debate that our constitutional scheme resolves through discourse, not judicial fiat." *See Stand With US Ctr. for Legal Just. v. Massachusetts Inst. of Tech.*, 158 F.4th 1, 17 (1st Cir. 2025) (declining to interpret the term "Zionism" as inherently antisemitic for the purposes of a Title VI claim); *see also Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, 765 F. Supp. 3d 245, 268 (S.D.N.Y. 2025) (resolving the case "without opining on whether conduct or speech hostile to Zionism, itself a term subject to a considerable variety of interpretations, is necessarily antisemitic."); *Johnson v. Georgetown Univ.*, No. 25-CV-1540 (CRC), 2026 WL 879522, at *18 n.18 (D.D.C. Mar. 31, 2026) ("The Court will not, and need not, try to answer this vexing question."). Indeed, anti-Zionism may be wielded in an antisemitic manner or to antisemitic ends. *See Stand With US*, 158 F.4th at 17 (citing *Gartenberg,* 765 F. Supp. 3d at 269 (finding that "From the river to the sea, Palestine will be free" graffiti on a bathroom stall that was "made to resemble the stylized font commonly associated with Hitler's *Mein Kampf*" could be used, among other evidence, to show antisemitic motivation)). However, "one person does not lose the right to express a political opinion on a matter of public concern merely because another who expresses the same view does so for condemnable reasons." *See id.*, at 17-18.

To be clear, an ambiguous euphemism or remark referring to a protected group can, in certain circumstances, suggest discriminatory intent. *See Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 253 (2d Cir. 2014) (finding that "the phrasing 'better fit' or 'fitting in' just might have been about race"); *Johnson v. New York City Dep't of Educ.*, 633 F. App'x 42, 43 (2d Cir. 2016) (holding a "fit in" comment could have racial implications in a given case); *Kelly v. Metro-N. Commuter R.R.*, No. 87 CIV. 5817 (JFK), 1989 WL 156298, at *6 (S.D.N.Y. Dec. 18, 1989) (finding it

12

"requires a logical leap of the smallest kind to conclude" that "fit in" comment referred to plaintiff's religious background as Jewish). However, in such cases where there is ambiguity surrounding the discriminatory nature of a comment, the plaintiffs pleaded facts — beyond the ambiguous comments themselves — tending to support as plausible an inference of cognizable discrimination. In *Abrams*, plaintiff plead he was a Black male, 764 F.3d at 247. In *Johnson*, plaintiff was the only African-American administrator at the school. 39 F. Supp. 3d at 319 (E.D.N.Y. 2014) And in *Kelly*, plaintiff observed Jewish religious practices on a weekly basis. 1989 WL 156298 at *4.

While the Court accepts for the purposes of this motion that the term "Zio" may constitute an antisemitic slur in some circumstances, an examination of the facts pleaded in the FAC shows that the term "Zio" was not used in an antisemitic manner here. Plaintiff has not alleged facts — aside from the ambiguous term itself — that, if true, would support his interpretation of "Zio" as antisemitic, nor his assertion that its use suggests SD's perception of Plaintiff as Jewish and/or Israeli. To the contrary, Plaintiff's factual description of the December 4, 2023, protest serves to undercut his understanding of the term "Zio." In his email to Professor Rabinovitz, Plaintiff describes the protest as a "pro [P]alestine walkout/barricade," not as an "antisemitic" demonstration, as he later begins to assert. This characterization of the protest's political goals aligns with Plaintiff's initial emails to TNS administrators, in which Plaintiff does not once mention that he felt the protests were "antisemitic," that he felt specifically targeted based on his appearance, that he felt Jewish students were singled out by the protestors, or that the term "Zio" was used by SD or VS during the protests. Rather, these early emails only seem to express general grievances about the protests having blocked Plaintiff's route to class. For example, in a December 5, 2023, email to several TNS administrators, Plaintiff writes that, "[r]espect for each individual's

right to express their beliefs is fundamental, but this should not extend to actions that impede access to educational facilities." It is only after Plaintiff was informed of the Title IX investigations against him that he begins to assert antisemitism, undermining the plausibility of his characterization of the protests and the antisemitic nature of the term "Zio."

The FAC shows that at the protest itself, SD did not call Plaintiff a "Zio" the moment he encountered Plaintiff. Rather, Plaintiff claims the term was used *after* the altercation between SD and Plaintiff escalated to physical contact, as SD was forcing Plaintiff out of the University Center vestibule. FAC ¶ 46. Even though Plaintiff claims that SD targeted some Jewish students, ¶ 51, the FAC does not once allege that the term "Zio" or "Zionist" was used directly to address these Jewish students. Rather, these and similar terms were used by SJP members in general chants ("all Zionists go to hell" and "Intifada until victory"), on posters ("Zionists fuck off"), on graffiti in campus bathrooms ("Abolish the settler state" and "Zionism is terrorism"), and at a teach-in by an outside lecturer on a different day than the protest in question (decrying "Zionist propaganda"). *Id*. ¶ 24. Taken together, facts about SJP-led protests suggest that these terms were used by SJP members to identify those at odds with SJP's political ideology. This interpretation is further supported by Plaintiff's belief that he was referred to as a "counter-demonstrator" in SD and VS's interview published in the *New School Free Press*. *Id*. ¶ 75. Such a label suggests the protestors viewed Plaintiff as a political opponent, and supports the conclusion that the term "Zio" was not used with antisemitic intent or animus. Indeed, Plaintiff may not "dictate the interpretation of the protestors' speech in order to suppress it, without any facts suggesting that the protestors were using these slogans in the way [he] claim[s]." *See Stand With US*, 158 F.4th at 19.

Because Plaintiff did not allege facts tending to support his assertion that he was perceived to be Jewish and/or Israeli, he fails to make a claim of lawful discrimination on the bases proscribed by Title VI.

**b. Plaintiff Does Not Plausibly Allege TNS's Deliberate Indifference to Hostile Environment**

A private damages action may lie against a school under Title VI in cases of student-on-student harassment only where the funding recipient acts with deliberate indifference to the known harassment. *See Zeno* 702 F.3d at 671 (citing *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 644–45 (1999)). In *Davis*, the Supreme Court outlined the deliberate indifference standard in the context of a Title IX claim. *See Davis*, 526 U.S. at 644–45. Application of the deliberate indifference standard has since been extended to other causes of action, including those arising under Title VI. *See, e.g., Fizulich v. Killings*, No. 1:22-CV-1190, 2026 WL 1686197, at *10 (N.D.N.Y. June 10, 2026); *Doe v. Columbia Univ.*, No. 25 CIV. 2132 (DEH) (RFT), 2026 WL 810421, at *10 (S.D.N.Y. Mar. 23, 2026), *reconsideration denied*, No. 25 CIV. 2132 (DEH) (RFT), 2026 WL 1831925 (S.D.N.Y. June 25, 2026); *Yourman v. Columbia Univ.*, No. 24 CIV. 6286 (JPC) (KHP), 2026 WL 480642, at *2 (S.D.N.Y. Feb. 20, 2026).

The deliberate indifference standard does not impose vicarious liability against a school, based on agency principles, for the conduct of its students. *See Davis*, 526 U.S. at 642. Rather, a recipient of federal funds may be liable for damages under Title VI only for its own misconduct, including excluding persons from participation in, denying persons the benefits of, or subjecting persons to discrimination under its programs or activities. *See id.* at 640-41. Liability under the deliberate indifference standard only arises if a plaintiff establishes that the school exercised substantial control over its students; the harassment was severe and discriminatory; the school had

actual knowledge of the harassment; and the school was deliberately indifferent to the harassment. *Id*.

Deliberate indifference requires that a school "intentionally acted in clear violation" of Title VI by remaining deliberately indifferent to acts of student-on-student harassment of which it had actual knowledge. *Id*. at 642. A school's mere negligence does not suffice to establish liability under this standard. *Id*. Rather, the school's response to the harassment or lack thereof must be "clearly unreasonable in light of the known circumstances" in order to constitute deliberate indifference. *Id*. at 648-49. Failing to remedy harassment is not a requirement under this standard, and a response must be more than *merely* unreasonable to constitute deliberate indifference. *Id*. Whether a funding recipient's response is "clearly unreasonable" is a matter of law. *Id*. at 649.

TNS is a recipient of federal funds, and is therefore subject to liability under Title VI for student-on-student harassment under the deliberate indifference standard. The parties do not dispute that TNS exercises substantial control over its students. Nor do the parties dispute that TNS had actual knowledge of the harassment, a fact made clear in Plaintiff's correspondence with various administrators at TNS regarding the Title IX and Title VI investigations following the December 4, 2023, protest.

Plaintiff alleges that TNS's deliberate indifference to the harassment he experienced from SD, VS, and other TNS students during and following the December 4, 2023 protest created a hostile environment in violation of Title VI. Plaintiff claims that TNS refused to investigate his Title VI complaint against SD for months; failed to enforce its no contact order, retaliation policy, and other relevant policies; refused to protect him from known ongoing harassment by SD and VS; exhibited incompetence and unprofessionalism in handling the grievance process; and published numerous factual inconsistencies in its investigation reports. FAC ¶¶ 176-184. Plaintiff

16

concludes that TNS's conduct constitutes deliberate indifference, which contributed to a hostile environment on campus that injured Plaintiff. *Id.* ¶¶

176, 185.

The allegations against TNS detailed in Plaintiff's complaint do not suggest that TNS's actions were "clearly unreasonable in light of the known circumstances." *See Davis*, 526 U.S. at 648-49. TNS's months-long delay in investigating Plaintiff's Title VI complaint, as alleged in the FAC, does not satisfy the clear unreasonableness standard. *Compare Nungesser v. Columbia Univ.*, 244 F. Supp. 3d 345 (S.D.N.Y. 2017) (declining to hold that Columbia's failure to investigate or cure the harms resulting from a defamatory campaign against the plaintiff were clearly unreasonable under Title IX); *with Zeno* 702 F.3d (holding a high  school's delay of over one year to investigate bullying and harassment, half-hearted remedial measures, and ignorance of substantiated signals that more action was needed constituted clear unreasonableness under Title VI). While it was arguably unprofessional for Charles-Bowie not to have communicated her personal circumstances — jury duty and illness — to Plaintiff prior to the delays they caused, liability does not arise under the deliberate indifference standard for mere unprofessionalism or lack of diligence. Similarly, Plaintiff's dissatisfaction with TNS's failure to provide specific resources to protect him on campus, even if promised, do not support a plausible inference that TNS exhibited deliberate indifference. *See Davis*, 526 U.S. at 648 (noting that "courts should refrain from second-guessing the disciplinary decisions made by school administrators"); *Zeno*, 702 F.3d at 666 (holding that administrators are not required to purge their schools of actionable peer harassment or to take particular disciplinary action, and victims do not have a right to specific remedial measures). Nor does Plaintiff's dissatisfaction with the result of the grievance process

17

support his conclusion that TNS's conduct was clearly unreasonable, even if the final reports contained factual errors, which at worst reflect negligence or mistakes.

Plaintiff also fails to sufficiently allege that TNS's conduct, even if taken to be deliberately indifferent, caused Plaintiff to experience or be vulnerable to further harassment. *See Davis*, 526 U.S. at 630 (holding that to constitute deliberate indifference, conduct must, at a minimum, cause students to undergo harassment or make them liable or vulnerable to it). Plaintiff claims that, during the months of delay he experienced after requesting an investigation, he was the target of continued social media harassment in violation of TNS's no-contact order and retaliation policy. However, Plaintiff does not allege facts tending to support his assertion that the unreasonableness of TNS's response was a factual cause of further harassment. *See Kollaritsch v. Michigan State Univ. Bd. of Trs.*, 944 F.3d 613, 622 (6th Cir. 2019) (holding that "the occurrence of further harassment is not enough by itself; the response's *unreasonableness* must have caused the further harassment"). Additionally, Plaintiff does not provide the dates or times of any social media posts following the ones made in the immediate aftermath of the December protest. Without this information, Plaintiff's allegations of further harassment are unavailing. Plaintiff also does not plead facts that show that TNS's response to his request for investigation caused a broader climate of hostility towards Jewish and/or Israeli students on campus, despite this climate being described in detail in the FAC. Even if Plaintiff had pleaded such facts, further harassment must be inflicted against the same victim, meaning the plaintiff cannot premise the further harassment element on conduct directed at third parties. *See Kollaritsch* 944 F.3d at 621-22.

Plaintiff claims that TNS's deliberate indifference to student-on-student harassment contributed to a hostile environment and caused him to experience mental and emotional distress, temporal and financial loss, interference with his education, and interference with his business

18

opportunities. FAC ¶ 186. While Plaintiff does allege that he had requested several extensions and, for one class, received a temporary mark of "incomplete" due to the stress of the investigation, his amended complaint also indicates that each of his accommodation requests were granted, which cuts against his claim of harm. *See Nungesser*, 244 F.Supp.3d at 369 (holding the plaintiff's fear to participate in class discussions and election to take a class pass/fail was not sufficient allegations of adverse impact to his ability to learn the class material or graduate). Further, Plaintiff does not allege a significant drop in his grade point average as a result of TNS's conduct. The Court in *Nungesser* held that a "mere decline in grades is not enough to survive a motion to dismiss a Title IX claim, particularly absent an allegation that it substantially affected his GPA as a whole or his ability to graduate." *Id.* at 369 (internal citations omitted). While Plaintiff does allege that his harassers attempted to interfere with his business opportunities with Steve Madden, he does not claim that these unchecked attempts were successful or had significant impacts on his job opportunities. "Allegations of a rescinded job offer not sufficient to show deprivation of or interference with plaintiff's educational experience as proscribed by Title IX." *Id.* at 370. Accordingly, even if Plaintiff were to have sufficiently pleaded deliberate indifference, he nevertheless failed to adequately allege that his educational opportunities were disrupted in clear violation of Title VI as a result of TNS's conduct.

Finally, the FAC does not allege that TNS perceived Plaintiff as Jewish and/or Israeli. Rather, it alleges that TNS knew that Plaintiff was neither Jewish nor Israeli. In his correspondence with various TNS administrators, White himself admits to this fact. FAC ¶ 175. TNS's conduct, even if deliberately indifferent to the student-on-student harassment Plaintiff alleges, does not indicate that TNS "intentionally acted in clear violation" of Title VI. *See Davis*, 526 U.S. at 642. Differently put, the FAC shows that TNS did not intend to remain deliberately indifferent to

Plaintiff's claims on any of the bases proscribed by the statute. For these reasons, Plaintiff's hostile environment claim against TNS fails.

### c. Plaintiff Does Not Plausibly Allege Disparate Treatment

In order for a plaintiff to make out a successful claim of disparate treatment against a recipient of federal funding under Title VI, he must allege intentional discrimination by the recipient on the bases proscribed by the statute. *See Nungesser,* 244 F.Supp.3d at 361-62 (holding under the most direct theory of Title IX liability, a plaintiff can establish a claim by showing that the defendant's intentional discrimination was a substantial or motivating factor for the defendant's actions). Unlike for hostile environment claims, courts reviewing disparate treatment claims do not adopt the deliberate indifference standard in lieu of requiring intentional discrimination by the recipient. *Id.* at 362.

Courts have applied the *McDonnell Douglas* burden shifting framework to Title VI claims. *See Salem*, 2023 WL 3509832, at *4 (finding Title VI claims "are subject to the burden-shifting framework") (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). To establish a prima facie case of Title VI discrimination "a plaintiff must allege either 'direct evidence of discriminatory conduct,' or, absent such evidence, that '(1) he is a member of a protected class; (2) he suffered an adverse action in pursuit of his education by defendant; (3) he was treated differently from similarly situated students who are not members of the protected class; and (4) he was qualified to continue in his educational pursuit.'" *Salem*, 2023 WL 3509832, at *4 (citing *Koumantaros v. City Univ. of New York,* No. 03 CIV10170GEL, 2007 WL 840115, at *8 (S.D.N.Y. Mar. 19, 2007) (cleaned up). If a plaintiff states a successful prima facie case, defendants have the burden of showing a legitimate, nondiscriminatory reason for their action. *See Salem*, 2023 WL

3509832, at *4. If the defendant does so, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the stated, legitimate reason was pretext for discrimination. *Id.*

Plaintiff claims that TNS rushed his Title VI investigation and treated it with less interest and seriousness than it did that of SD. FAC ¶ 97. Plaintiff also asserts that TNS's disparate treatment was a form of discrimination against him as a person perceived to be Jewish and/or Israeli. *Id.* ¶ 96.

Plaintiff fails to allege that he is a member of a protected class as is required by the first element of a prima facie case of disparate treatment. Because Plaintiff does not provide a sufficient factual basis for his conclusion that he was perceived by his peers to be Jewish and/or Israeli, he fails to allege facts supporting the plausibility of this claim. Further, the FAC makes it abundantly evident that TNS itself did not perceive Plaintiff as Jewish and/or Israeli. Because TNS had actual notice and knowledge of Plaintiff's actual race and national origin, any disparate treatment Plaintiff experienced by TNS during the investigation process, even if taken as true and harmful to his educational experience, was not a form of intentional discrimination on any of the bases proscribed by Title VI.

Even if Plaintiff had adequately alleged that TNS itself perceived Plaintiff to be Jewish and/or Israeli, which he had not, Plaintiff further fails to meet the third element of a prima facie case of Title VI discrimination, because he does not mention whether SD was also perceived by TNS as Jewish and/or Israeli. He does not mention any facts about SD's appearance or background to support the plausibility of the conclusion that Plaintiff was treated differently from someone outside of his ostensible protected class, that is, persons perceived to be Jewish and/or Israeli. Accordingly, Plaintiff's disparate treatment claim fails.

### d. Plaintiff Does Not Plausibly Allege Retaliation

Plaintiff's retaliation claim suffers for the same reasons set forth above. *See supra* Section I(a). His underlying harassment and discrimination claims are not actionable under Title VI. Thus, his complaint to TNS in opposition to SD and VS's conduct is not protected activity, and TNS's subsequent conduct could not have been retaliatory under Title VI.

Plaintiff correctly states that a plaintiff need not be factually correct in identifying a practice he believed to have violated Title VI to make out a successful claim of retaliation. *See Palmer v. Penfield Cent. Sch. Dist.*, 918 F. Supp. 2d 192 (W.D.N.Y. 2013); *Verdi v. City of New York*, 306 F. Supp. 3d 532 (S.D.N.Y. 2018). However, as Defendant observes, the reasonableness of a plaintiff's mistaken belief must be assessed subjectively and objectively. *See Bloomberg v. New York City Department of Education,* 2025 WL 673059 (S.D.N.Y. 2025).

Plaintiff believes that his Title VI complaint to TNS regarding SD's harassment is protected activity, and that TNS discriminated against Plaintiff by retaliating against him through several adverse actions, including arbitrarily refusing to enforce its policies, refusing to adequately investigate his complaint, refusing to dismiss the false and malicious grievances against him brought by SD and VS, and conducting the grievance process in a biased, arbitrary, and unjust manner. FAC ¶ 218.

It is clear from the plain text of the statute that Title VI does not impose civil liability against individual students, who are not recipients of federal funding, for harassment or discrimination against other students. Rather, the statute only holds recipients of federal funding liable. While SD may have violated TNS's policies in his treatment of Plaintiff, the only possible lawful discrimination complaint Plaintiff could make is against TNS, not SD. *See McMenemy*, 241 F.3d at 283 (quoting *Silver v. KCA, Inc.*, 586 F.2d 138, 141 (9th Cir.1978) ("[N]ot every act by an

employee in opposition to racial discrimination is protected [under Title VII]. The opposition must be directed at an unlawful employment practice of an employer, not an act of discrimination by a private individual.")). Plaintiff does not provide arguments to support the objective reasonableness of his mistaken belief, despite explaining that he subjectively believed his complaint against the student protestors was protected activity. Plaintiff's complaint to TNS is not protected activity because there is no objectively reasonable basis to believe that his opposition to the protestors' conduct was directed at lawful discrimination by a recipient of federal funding as proscribed by Title VI. *Compare Orellana,* 2016 WL 4480720, at \*8-\*9 (holding that plaintiff's mistaken belief that an employee calling him a "stupid idiot immigrant" and unfairly assigning him work tasks violated Title VII was not objectively reasonable); *with McMenemy*, 241 F.3d at 285 (finding as reasonable plaintiff's mistaken belief that the Union was an employer). Plaintiff's mistaken belief that his complaint against SD was about lawful discrimination is not objectively reasonable. Therefore, his treatment by TNS could not have been retaliatory under Title VI.

## II.   Plaintiff's State Law Claims

Having dismissed Plaintiff's federal claims, the only claims over which this Court had original jurisdiction, the Court now decides whether to exercise supplemental jurisdiction over the state law claims. Under 28 U.S.C. § 1367(c), "[a] district court 'may decline to exercise supplemental jurisdiction over a claim' once it 'has dismissed all claims over which it has original jurisdiction.'" *See Morgan v. Lululemon Athletica Inc.*, No. 23-CV-434 (VSB), 2025 WL 3211747, at \*6 (S.D.N.Y. Nov. 18, 2025) (declining to exercise supplemental jurisdiction over plaintiff's NYSHRL, NYSCRL, and NYCHRL claims after dismissing plaintiff's federal American Disabilities Act claim). It is within the Court's "sound discretion" to decide whether to exercise supplemental jurisdiction. *See id.* (citing *Lundy v. Cath. Health Sys. of Long Island Inc.*, 711 F.3d

23

106, 117 (2d Cir. 2013)). When declining to exercise supplemental jurisdiction over state law claims, such claims should be dismissed without prejudice. *See Pina v. Bank of Am. Corp.*, No. 25-1698, 2026 WL 1084619, at *2 (2d Cir. Apr. 22, 2026) (citing *Green v. Department of Education of City of New York*, 16 F.4th 1070, 1074 (2d Cir. 2021) ("[D]ismissals for lack of subject matter jurisdiction must be without prejudice, rather than with prejudice.")).

Here, because the Court dismisses Plaintiff's federal law claims, it declines to exercise supplemental jurisdiction over the state law claims at this time. Since the federal claims are dismissed without prejudice, Plaintiff may amend his Complaint to cure the infirmities with the federal causes of action. If, however, Plaintiff fails to adequately amend his Complaint to correct its inadequacies, the Court would decline to exercise supplemental jurisdiction over the state law claims. *See Brzak v. United Nations*, 597 F.3d 107, 113–14 (2d Cir. 2010) (holding that a plaintiff's state law claims should be dismissed when plaintiff's federal claims are dismissed before trial)). Plaintiff's state law claims are, therefore, dismissed without prejudice.

## CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss Plaintiff's federal law claims is **GRANTED** without prejudice. Plaintiff can amend his Complaint by July 22, 2026 if he so chooses.

**SO ORDERED.**

**Dated: July 14, 2026**
**New York, New York**

**ANDREW L. CARTER, JR.**
**United States District Judge**

24